Francis W. HILL, Jr., et al., Plaintiffs,

v.

BELLEVUE GARDENS, INC., et al., Defendants.

Francis W. HILL, Jr., Plaintiff,

v.

BELLEVUE GARDENS, II, INC., et al., Defendants (two cases).

Civ. A. Nos. 3968–56, 3969–56.

United States District Court
District of Columbia.
Dec. 1, 1960.

See also 169 F.Supp. 871.

Edmund D. Campbell, Benjamin W. Dulany, Ronald E. Madsen, Douglas, Obear & Campbell, Washington, D. C., for plaintiffs.

John Lewis Kelly, Washington, D. C., for defendants Bellevue Gardens, Inc., Bellevue Gardens II, Inc., Donal L. Chamberlin, Ellen F. Chamberlin, Harold G. Free and Ruth H. Farnham.

Louis B. Arnold, Washington, D. C., for defendants Bellevue Gardens III, Inc., Bellevue Gardens IV, Inc. and Kennedy-Chamberlin, Inc.

James E. Artis, Washington, D. C., for defendant J. Howard Hixson, Sr.

MATTHEWS, District Judge.

The Court, having considered the evidence in these consolidated actions, hereby makes and enters the following

### Findings of Fact

1. In 1942, a partnership composed of Edgar S. Kennedy (now deceased), the defendant Donal L. Chamberlin and the defendant Ellen F. Chamberlin (wife of Donal L. Chamberlin) acquired a thirty-one acre tract of land in southwest Washington commonly called the Didlake property for the purpose of constructing an apartment development thereon. Kennedy had a one-half interest and Mr. and Mrs. Chamberlin together had a one-half interest. In that year and in 1943 the partners conveyed separate portions of that property to two corporations which they had formed, known as Bellevue Gardens, Inc. (hereafter called Bellevue I) and Bellevue Gardens II, Inc. (hereafter called Bellevue II). They then had these two corporations build

large garden type apartment projects on these properties, with the aid of F.H.A. financing.

2. Kennedy and Chamberlin caused Bellevue II, in 1943 to issue 100 shares of common stock, divided as follows: (a) to Kennedy, 49 shares; (b) to Chamberlin and his wife, 49 shares; and (c) to the defendant J. Howard Hixson, a long-time employee of various Kennedy and/or Chamberlin corporations and/or trusts, 2 shares. There have been no changes in the ownership of this stock since its original issuance, except that the Kennedy stock passed to his estate on Kennedy's death in 1953. All of the stock of this corporation was validly issued; and plaintiff's claim that Hixson holds his 2 shares as trustee has not been substantiated. The Court finds that Hixson is the beneficial as well as the legal owner of 2 shares of stock in Bellevue II.

3. Kennedy and Chamberlin caused Bellevue I, in 1943, to issue 2,617 shares of common stock, divided as follows: (a) to Donal L. Chamberlin and his wife, 1197 shares; (b) to Edgar S. Kennedy and members of his family, including Mary K. Nelms, and Rachel Sisson, 1037 shares; (c) to A. P. Gaynor, 40 shares, to J. Howard Hixson, 171 shares, A. H. Sonnemann, 122 shares, and H. G. Free, 50 shares. At the time of the institution of these actions the 2,617 outstanding shares of stock of Bellevue I was divided as follows: (a) 1,479 shares were owned by the defendants Chamberlin and wife, Hixson, Farnham as trustee, and Free as trustee and individually (20 of these shares being in *inter vivos* trusts created by Chamberlin and his wife); and (b) 1,138 shares were owned by the several plaintiffs.

4. After the Bellevue I and Bellevue II apartment projects were constructed, Kennedy and Chamberlin, as partners, caused these corporations to make contracts with them whereby (a) the Kennedy-Chamberlin partnership would act as "rental agent" in the management of the apartment projects for seven years and receive a 5% commission on all rents; and (b) the partnership would install furniture in some sixty apartments, and would receive all of the rental from such furniture. Under these arrangements the partnership assumed the salary of the resident manager of the apartment project and her assistant.

5. The Kennedy and Chamberlin partnership thereupon proceeded to buy furniture for the apartment project on a small down payment, installed the furniture in the apartments, received the rentals therefrom, and paid for the furniture itself largely out of such rentals.

6. In 1944 Kennedy and Chamberlin formed a corporation under the name of the defendant Kennedy-Chamberlin, Inc., with a capital stock of 100 shares equally divided between the two partners. Kennedy and Chamberlin, the partnership, conveyed to Kennedy-Chamberlin, Inc., the corporation, legal title to the remaining land in the Didlake tract, and assigned to Kennedy-Chamberlin, Inc. the so-called "management" and "furniture" contracts.

7. Despite the execution by Bellevue II of the original management contract, Kennedy-Chamberlin, Inc. did not realize any rental commissions under it. However, Kennedy-Chamberlin, Inc. did receive 5% rental commissions under the original contract with Bellevue I, until its expiration in 1950, and thereafter continued to receive the commissions on a monthly basis.

8. Kennedy-Chamberlin, Inc., built four stores on a portion of the Didlake tract, fronting on Nichols Avenue, and rented these stores.

9. In 1953 Kennedy-Chamberlin, Inc., sold another portion of the Didlake tract to Chamberlin *inter vivos* trusts, which had been created by Donal Chamberlin and his wife for the benefit of his children and Mrs. Farnham. This property in turn was conveyed to two new corporations known as Bellevue Gardens III, Inc. (Bellevue III) and Bellevue Gardens IV, Inc. (Bellevue IV) and received in exchange all of the capital stock of these two corporations. Bellevue III and Bellevue IV thereupon constructed apartment projects on said properties similar

to, but somewhat smaller in size than those of Bellevue I and Bellevue II.

10. Edgar S. Kennedy died on August 21, 1953, and the plaintiff Francis W. Hill, Jr. and the defendant Hixson were appointed and qualified as executors under his last will and codicil, which were duly probated in this Court. Hill is still acting as executor, but Hixson resigned, at the request of the beneficiaries under the will, on July 9, 1956.

11. Upon Kennedy's death his estate became the owner of a one-half interest in Kennedy-Chamberlin, Inc. (50 shares); 49 out of 100 shares of Bellevue II; and 708 out of 2617 shares of Bellevue I, The estate subsequently acquired 24 additional shares in Bellevue I. 427 shares in Bellevue I are owned by the remaining plaintiffs in this suit.

12. The defendants, Harold G. Free, Ruth H. Farnham and J. Howard Hixson, had been employed in the various Kennedy-Chamberlin enterprises for many years prior to Kennedy's death. Mrs. Farnham was also Mr. Chamberlin's personal secretary. At all times after Kennedy's death the stock owned by them in Bellevue I, together with that owned by Donal L. Chamberlin and his wife, constituted a majority of the outstanding stock of Bellevue I; and Hixson's stock, together with the stock owned by Donal L. Chamberlin and his wife in Bellevue II, constituted a majority of the outstanding stock of Bellevue II. Since Kennedy's death the defendants Ellen F. Chamberlin, Free, Farnham and Hixson have been under the domination of Donal L. Chamberlin in matters affecting Bellevue I and Bellevue II.

13. After Kennedy's death, Chamberlin, with the collaboration of his wife, and of Hixson, Free and Farnham, having control of the majority stock likewise obtained complete control of the directorates of all of the corporations above mentioned. Since the middle of 1954 Donal Chamberlin, Free and Farnham, together with either Hixson or Ellen Chamberlin (or both), have constituted a majority of the boards of directors of Bellevue I, Bellevue II, Bellevue III,

Bellevue IV, Kennedy-Chamberlin, Inc. and another corporation hereafter referred to, known as Kennedy Chamberlin Development Co. of Maryland. In abuse of their trust as directors, said defendants have used this control, through the means of the interlocking directorates referred to, so as to wrongfully oppress the estate of Edgar S. Kennedy and the other plaintiffs as minority stockholders of Bellevue I and Bellevue II, in the manner hereafter set forth.

14. During Kennedy's lifetime, in 1949, Kenwood Golf and Country Club became obligated to Bellevue I and II in the amounts of $70,000 and $35,000 respectively. This Club is a private corporation, organized for profit, and at that time a majority of its stock was owned in an *inter vivos* trust which had been created by Kennedy. Neither Bellevue I nor II, at any time, owned any stock in Kenwood Golf and Country Club.

15. On March 28, 1954 (after Kennedy's death), Chamberlin arranged to acquire majority ownership of the stock of Kenwood Golf and Country Club by having that Club purchase that portion of its own stock which had been previously owned by the *inter vivos* trust which Kennedy had created. In order to accomplish this, Chamberlin, on March 30, 1954, for his own benefit and for the benefit of Kenwood Golf and Country Club and not for the benefit of Bellevue I, caused the Board of Directors of Bellevue I (composed of himself, Hixson and Free) to adopt a resolution extending the aforementioned $70,000 loan from Bellevue I to Kenwood Golf and Country Club for a period of seventeen years, with interest at the rate of 4%. The loan was at that time in default in interest to the extent of $9,544.45 and was completely unsecured. Kenwood Golf and Country Club repaid this loan after this suit was filed.

16. Similarly, on March 30, 1954, Chamberlin for his own benefit and for the benefit of Kenwood Golf and Country Club and not for the benefit of Bellevue II, caused the Board of Directors of Bellevue II (which was then composed

only of himself and Hixson) to adopt a resolution extending Bellevue II's existing $35,000 loan to Kenwood Golf and Country Club for a period of seventeen years, with interest at 4%. This loan was also at that time in default in interest to the extent of $4,233 and was completely unsecured. Kenwood Golf and Country Club has also repaid that loan after this suit was filed.

17. In the spring of 1954 Chamberlin conducted negotiations with Hill as executor of the Kennedy estate for the purchase of the one-half interest of the Kennedy estate in Kennedy-Chamberlin, Inc. At that time of such negotiations Chamberlin, who was then president of both Bellevue I and Bellevue II, represented to Hill that the Directors of Bellevue I had adopted resolutions to cancel the so-called "management" contract between Bellevue I and Kennedy-Chamberlin, Inc. (under which Kennedy-Chamberlin, Inc. was then receiving substantial commissions) and that the directors of both Bellevue I and Bellevue II had also adopted resolutions to cancel the "furniture" arrangement under which Kennedy-Chamberlin, Inc. was then receiving substantial rentals from furniture in Bellevue I and Bellevue II. Hill informed Hixson of said representations, and Hixson, who together with Chamberlin, was then a member of the board of directors of both Bellevue I and Bellevue II, did not deny them. Hill believed and relied on these representations of Chamberlin, which if true, would have substantially reduced the income of Kennedy-Chamberlin, Inc. No such resolutions were in fact passed but in reliance on said representations Hill (with Hixson's concurrence as co-executor) petitioned and obtained authority from the Probate Court on June 28, 1954, to accept an offer from Chamberlin as "agent" to purchase the 50% interest of the Kennedy estate in Kennedy-Chamberlin, Inc. for $50,000. This price was substantially less than the net book asset value of the 50% interest as disclosed by financial statements of the company supplied by the defendant Hixson.

18. Two days later, on June 30, 1954, at a meeting of the board of directors of Bellevue I, the membership of the board was increased to seven members, and Hill was made a member of the board. The other members of the board at that time (and ever since) were Chamberlin, Ellen Chamberlin, Hixson, Free, Farnham, and one Owen Kiser, who was an employee for many years of one or more of the Kennedy-Chamberlin corporations. All of the members were in attendance at said meeting. At this meeting Chamberlin, with the collaboration of the other directors (except Hill), including the defendants Hixson, Free and Farnham, caused a resolution to be adopted, over Hill's objection, authorizing the president (Chamberlin) and the secretary (Farnham) to negotiate and execute a fifteen year non-cancellable rental management contract with Kennedy-Chamberlin Development Co. of Maryland, a new corporation. Unknown to Hill, said Kennedy-Chamberlin Development Co. of Maryland was owned completely by Chamberlin, Hixson, Free and Farnham, who were also its sole officers and directors. They did not disclose their interest to Hill.

19. On July 19, 1954, at a meeting of the board of directors of Bellevue II, that board was similarly enlarged with the same persons added to the board; and substantially similar resolutions were thereupon adopted by Bellevue II (over Hill's objection) for negotiation of a fifteen year non-cancellable rental management contract between Bellevue II and Kennedy-Chamberlin Development Company of Maryland. No disclosure was made by Chamberlin, Hixson, Free or Farnham at this meeting of their interlocking interest in Kennedy-Chamberlin Development Company of Maryland.

20. On July 19, 1954, Hill and Hixson, as executors of the Kennedy estate, finally consummated the sale to Chamberlin "as agent" of the estate's one-half interest in the stock of Kennedy-Chamberlin, Inc. pursuant to the contract of June 28, 1954. They delivered the stock to Chamberlin and received payment therefor.

Hill then learned definitely for the first time that Chamberlin had caused Kennedy-Chamberlin, Inc. itself to become the purchaser of the shares, which thereupon became treasury stock.

21. Some months prior to the sale of the Kennedy-Chamberlin stock by the Kennedy estate, Chamberlin and his wife had caused 50 shares in Kennedy-Chamberlin, Inc. to be transferred to the Chamberlin *inter vivos* trusts, for the benefit of his children and Mrs. Farnham, so that upon the completion of the sale above referred to the Chamberlin trusts became the sole owner of all of the outstanding stock of Kennedy-Chamberlin, Inc. Hill, who had formerly been Mr. Chamberlin's attorney and had also been one of the trustees of the Chamberlin trusts subsequently resigned as trustee and the trustees of the Chamberlin trusts thereupon became and still are Free, Farnham and John Lewis Kelly. The latter is attorney for Chamberlin in these proceedings, and attended board and stockholders' meetings of Bellevue I and Bellevue II in behalf of the "Chamberlin interests".

22. On July 19, 1954, a few hours after Hill had consummated the sale by the Kennedy estate of its stock interest in Kennedy-Chamberlin, Inc., Chamberlin asked Hill for a conference which was had on July 20, 1954. At that conference Chamberlin presented Hill with a letter to Chamberlin from Snyder, Farr & Co., accountants, dated July 15, 1954, four days prior to the consummation of the sale, in which letter reference was made to a possible liability from Bellevue II to Kennedy-Chamberlin, Inc. of approximately $70,000 for alleged management commissions under the old management contract referred to in finding No. 7, above. Chamberlin stated that he was not making any actual claim for such commissions on behalf of Kennedy-Chamberlin at that time. Hill thereupon immediately sent Chamberlin a letter protesting the prior non-disclosure of this claim and demanding complete rescission of the sale of the Kennedy estate's stock in Kennedy-Chamberlin,

Inc.; said possible liability of $70,000 had not appeared as an asset in a financial statement of Kennedy-Chamberlin, Inc.'s prepared by Hixson nor as a liability in Bellevue II's financial statement.

23. As a result of the objections of Mr. Hill and after discussion between Hill and Kelly, among others (Kelly acting as attorney for the Chamberlin interests), the following transpired on August 2, 1954; (a) the boards of directors of Bellevue I and Bellevue II passed resolutions rescinding their resolutions authorizing the making of long-term rental management contracts with Kennedy Chamberlin Development Company of Maryland; (b) agreement was reached that the executors of the Kennedy estate would be given a ninety day option to offer the Bellevue I and Bellevue II properties for sale at an agreed price, during which period Kennedy-Chamberlin, Inc. would continue to receive rental commissions of 5% from said properties; and (c) agreement was reached that Kennedy-Chamberlin, Inc. would release Bellevue II from any claim for commissions under the old management contract, referred to in Findings 7 and 22 above among others, and the sale of the estate's stock in Kennedy-Chamberlin would be allowed to stand. No sale of the Bellevue I or Bellevue II properties was effected during the ninety day option period, and the option was not extended.

24. On July 19, 1954, and August 2, 1954, Chamberlin, with the collaboration of Mrs. Chamberlin, Farnham, Free and Hixson and over the protests of Hill, caused the boards of directors of Bellevue I and Bellevue II to adopt resolutions providing for the payment of a monthly subsidy by these corporations to Kennedy-Chamberlin, Inc. in the aggregate amount of $210 a month under the guise that this was necessary in order to encourage the renting of the four stores owned by Kennedy-Chamberlin, Inc. and adjacent to the Bellevue properties. No subsidy was voted to be paid to Kennedy-Chamberlin, Inc. by Bellevue III and Bellevue IV which were then wholly owned by the Chamberlin trusts. The

Court finds that said subsidy was in fact for the benefit of Kennedy-Chamberlin, Inc. and not for the benefit of Bellevue I or Bellevue II. At meetings of the boards of directors of Bellevue I and II held a year or more later, these subsidy resolutions were rescinded and no moneys were actually paid to Kennedy-Chamberlin, Inc. under them.

25. On February 3, 1955, at meetings of the boards of directors of Bellevue I and Bellevue II, Chamberlin, Mrs. Chamberlin, Hixson, Free and Farnham, acting as directors of said corporations, and constituting a majority of each board, caused resolutions to be adopted by Bellevue I and Bellevue II providing for new rental management contracts between these corporations and Kennedy-Chamberlin, Inc. at a commission of 3% of the gross rents, such contracts to run indefinitely but subject to termination upon thirty days' notice. Hill protested the adoption of said resolutions. At the time these resolutions were adopted and at all times since, the Chamberlin trusts owned all of the capital stock of Kennedy-Chamberlin, Inc. the trustees of the Chamberlin trusts were and still are Free, Farnham and Kelly; and the directors of Kennedy-Chamberlin, Inc. were and still are Chamberlin, Hixson, Free and Farnham. The court finds that said directors supported said resolutions at the board meetings of Bellevue I and Bellevue II in order to benefit Kennedy-Chamberlin, Inc. rather than to benefit Bellevue I and/or Bellevue II.

26. Upon the adoption of the resolutions of February 3, 1955, above referred to, the individual defendants Free and Farnham executed new "management" contracts on behalf of Bellevue I and Bellevue II, respectively, with Kennedy-Chamberlin, Inc. The said contracts were executed on behalf of Kennedy-Chamberlin, Inc. by the defendants Chamberlin and Farnham. Thereupon, without any prior disclosure to Hill, and without any authority by virtue of the new management contracts so to do, the individual defendants caused Kennedy-Chamberlin, Inc. to cease paying the salary of the resident manager and her assistants in the Bellevue apartments and such salaries, which had previously been paid by Kennedy-Chamberlin, Inc. were taken over and assumed by Bellevue I and Bellevue II. At a later date portions of said salaries were assumed and taken over by Bellevue III and Bellevue IV. The salary of Mrs. Farnham, which had also previously been paid by Kennedy-Chamberlin, Inc. was discontinued by that corporation on June 30, 1955, and as of July 1, 1955 she began to receive a salary from Bellevue I. At a later date she also began to receive a salary from Bellevue II.

27. Pursuant to the resolutions of February 3, 1955, above referred to, and the contracts entered into pursuant thereto, which resolutions and contracts have never been rescinded or modified, Bellevue I has paid to Kennedy-Chamberlin monthly commission checks aggregating (to December 31, 1959) $33,206.28; and Bellevue II has paid to Kennedy-Chamberlin, Inc. monthly commission checks aggregating (to December 31, 1959) $22,472.21. Hill has continued to protest said management contract upon the ground that the same persons purporting to act for Kennedy-Chamberlin, Inc. are officers and paid employees of Bellevue I and Bellevue II (Mr. Chamberlin is a director but not an officer of Bellevue I and II).

28. Since the execution of the management contracts of February 3, 1955, Bellevue I and Bellevue II, through their paid resident manager, have interviewed all prospective tenants and taken their rental applications. All leases have been executed directly by Bellevue I and Bellevue II and in their own respective names, through their resident manager and/or her assistant as agent. Bellevue I and Bellevue II, through their resident manager, collect their own rents, and deposit these rents to their own bank accounts. Bellevue I and Bellevue II also employ and pay from their own bank accounts the resident manager, the assistant resident manager, the project superintendent, and all maintenance personnel (with

allocation of parts of their salaries from Bellevue III and Bellevue IV). Bellevue I and Bellevue II's resident manager and her assistants are supervised by the defendant Free, who is the paid president of Bellevue I and Bellevue II. All rentals are posted and books of account from the apartment operation are kept in the names of Bellevue I and Bellevue II and are posted by the defendant Farnham who is the paid secretary of these corporations. Financial advice is given to the corporations by the defendant Hixson who is their paid vice president. Repairs are supervised by Free and Farnham and payments for these repairs are made directly from the bank account of Bellevue I and Bellevue II through checks signed generally by Free as an officer of these companies. The only financial transaction between the companies and Kennedy-Chamberlin, Inc. in connection with these rental operations, is the transmission of monthly commission checks from Bellevue I and Bellevue II to Kennedy-Chamberlin, Inc.

No books of this operation are kept in the name of Kennedy-Chamberlin, Inc. No monthly statements or any other kind of statements are ever rendered to Bellevue I and Bellevue II by Kennedy-Chamberlin, Inc. The latter corporation has no paid officers or employees except (a) the defendant Hixson (who testified that he had nothing to do with the management of Bellevue I or Bellevue II) and (b) a man named Drew who is employed by Kennedy-Chamberlin, Inc. to move and repair its own furniture which is in the Bellevue projects. The officers of Kennedy-Chamberlin, Inc. are the same persons who are officers of Bellevue I and Bellevue II, except that the defendant Chamberlin is president of Kennedy-Chamberlin, Inc. and is only a director of Bellevue I and II (since his resignation from the presidency of those companies in February, 1955). Chamberlin draws no present salary from either Kennedy-Chamberlin, Inc. or from Bellevue I or II. He performs certain advisory services in the management of the apartments.

■ The Court finds that the management contracts of February 3, 1955, between Bellevue I and Bellevue II on the one hand and Kennedy-Chamberlin, Inc. on the other are not fair to Bellevue I and Bellevue II; Kennedy-Chamberlin, Inc. and the defendants Chamberlin, Hixson, Free and Farnham, as directors of all of these companies, have wrongfully, and in abuse of their trust, caused assets of Bellevue I and Bellevue II to be siphoned off for the benefit of Kennedy-Chamberlin, Inc. and the Chamberlin trust as its sole stockholder; and that Kennedy-Chamberlin, Inc. and said individuals are liable to Bellevue I in the sum of $33,206.28 and to Bellevue II in the sum of $22,472.21, with interest, representing commissions paid under said contracts to December 31, 1959, plus any commission payments since that date.

29. Despite the respresentations made by Chamberlin to Hill in May, 1954, that the furniture "concession" from Bellevue I and Bellevue II to Kennedy-Chamberlin, Inc. would be cancelled and Hill's sale of the Kennedy stock in Kennedy Chamberlin, Inc. in reliance upon that representation, Kennedy-Chamberlin, Inc. over Hill's protest has continued since June 30, 1954, to "rent" furniture to tenants in Bellevue I and Bellevue II without any compensation whatever to those corporations. In fact since February 3, 1955, this rental business has been run by Bellevue I and Bellevue II, through their own paid resident manager, for Kennedy-Chamberlin's account. She or her assistant, likewise paid by Bellevue I and II, handles all applications for rental of Kennedy-Chamberlin's furniture in the Bellevue apartments, collects the rentals therefor (in a single rent payment from the tenant for the apartment and the furniture, deposits the furniture rent in Kennedy-Chamberlin's account, supervises the moving and cleaning of the furniture and furnishings, supervises Kennedy-Chamberlin's one employee (the furniture mover) and stores unused furniture in four basement rooms in Bellevue I,—all without any

compensation whatsoever to Bellevue I and Bellevue II.

The Court finds that the use of this furniture in the apartments of Bellevue I and Bellevue II has at times been an advantage to Bellevue I and Bellevue II in the renting of their apartments; but the Court also finds that it has likewise at times been a disadvantage in that the turnover of furnished apartments is greater than that of unfurnished apartments with resulting increased maintenance costs to the apartment owner. The Court also finds that Bellevue I and Bellevue II are entitled to reasonable compensation for services of employees of Bellevue I and II in the renting of the furniture and in the collection of such rents, for the storage of some of this furniture in basement rooms of Bellevue I and II, and for the use of their apartments for Kennedy-Chamberlin's furniture.

30. From January 1, 1955, through December 31, 1959, there has been paid to Kennedy-Chamberlin, Inc. as rental for furniture in Bellevue I and Bellevue II the total sum of $61,547.89. The Court finds that reasonable compensation to Bellevue I and Bellevue II from Kennedy-Chamberlin, Inc. for the furniture arrangement referred to above is 15% of the gross rentals received by Kennedy-Chamberlin, Inc. for such furniture to be computed from February 3, 1955 and that Kennedy-Chamberlin, Inc. and the individual defendants Chamberlin, Hixson, Farnham and Free, having practicipated in such arrangement, through their interlocking directorates in Bellevue I and Bellevue II and Kennedy-Chamberlin, Inc. are also personally liable for the payment of such compensation to Bellevue I and Bellevue II, plus 15% of the gross furniture rental income since that date.

31. From January 1, 1955, to date the properties of Bellevue I, II, III and IV have all been managed from a single office located in the property of Bellevue II, having a rental value of $75 per month. The defendants Chamberlin, Free and Farnham are all officers and controlling directors of Bellevue III and IV and have permitted Bellevue III and Bellevue IV to use said office in the property of Bellevue II without contributing any part of said office rental value. The Court finds that Bellevue III and Bellevue IV should each pay a reasonable proportion of such office rental; that a reasonable proportion of such cost to be assessed against Bellevue III would be 14% and that a like amount would be reasonable for Bellevue IV. These sums amount to $126 per year to be assessed against Bellevue III and a like amount to be assessed against Bellevue IV for the benefit of Bellevue II.

32. According to financial statements of Bellevue I and Bellevue II which were submitted to Mr. Hill by the defendant Hixson, an officer of these companies, the book value of the stock of the Kennedy estate in Bellevue I on December 31, 1953, was $168,999.60 and the book value of the interest of the Kennedy estate in Bellevue II was then $130,793.25. The properties were appraised early in 1954 by Charles C. Koones and Thornton Owen, District of Columbia appraisers, and if their appraised values are substituted for the book values of the physical properties of Bellevue I and Bellevue II, this would increase the value of the Kennedy stock in the two companies to $290,988 for Bellevue I and to $238,986.48 for Bellevue II.

Both Bellevue I and Bellevue II are subject to mortgages which bear reasonable curtail and which mature in 1967. In six years following Mr. Kennedy's death the surplus of Bellevue I increased (after dividends) from $165,895.20 to $244,164.53, and the surplus of Bellevue II has increased from $74,415.93 to $107,798.72. Bellevue I has built up a cash reserve of over $100,000 (after dividends) in seven years since Mr. Kennedy's death, yet a total of only $65,425 has been paid in dividends on the stock of Bellevue I, amounting to approximately 1¾% per annum on the book value and approximately 1% per annum on the value based on the Koones and Owen appraisals. Since Mr. Kennedy's death nothing whatever has been paid by way

of dividends on the stock of Bellevue II. Defendant Chamberlin has admitted that he favored a very conservative policy in the declaration of dividends for these corporations and has admitted that the amount of these dividends might be a factor in determining the market value of the companies' stocks. The Kennedy estate has not been able to obtain any offer for the stock of Bellevue I and Bellevue II remotely approaching the book value of this stock from the corporations themselves, from Mr. Chamberlin, or from any outside source.

33. The Court finds that the conduct of Chamberlin, Hixson, Farnham and Free as set forth in these findings and the failure of Bellevue I and Bellevue II to pay more dividends have resulted in unduly depressing the market value of the stock in these companies held by the Kennedy estate.

34. Chamberlin, Hixson, Farnham and Free have resisted efforts of the Kennedy estate to obtain dissolution of Bellevue I and Bellevue II or a sale of their assets, and have declined to vote for a slate of directors proposed by Mr. Hill to accomplish this.

35. The Court finds that the disputes between Mr. Hill as executor of the Kennedy estate and the other plaintiffs who are beneficiaries of the Kennedy estate, on the one hand, and Chamberlin, Hixson, Farnham and Free, on the other, have resulted in extreme tension and dissention in the corporate affairs of Bellevue I and Bellevue II, that such tension and dissention have been aggravated by this long litigation, and are apt to continue in the future.

36. The Court finds that since the death of Edgar S. Kennedy the individual defendants have acted in bad faith in their management of Bellevue I and Bellevue II and have acted for their own benefit or for the benefit of other corporations owned or controlled by Donal L. Chamberlin, rather than for the benefit of all stockholders of Bellevue I and Bellevue II.

37. The Court finds that the conduct of the individual defendants with respect to their fiduciary duties as directors of Bellevue I and Bellevue II, as set forth in these findings, and their attitude on the stand in this trial has evidenced a pattern of behavior which is apt to result in the same disregard by them of fiduciary responsibility in the future as has existed in the past, with respect to the operations of Bellevue I and Bellevue II, to the detriment of plaintiffs or their successors in interest as minority stockholders in said companies.

38. Bellevue I and Bellevue II are Delaware corporations. Bellevue III and Bellevue IV are Maryland corporations. The only business of these four corporations is the ownership and management of their apartment properties, all of which are located within the District of Columbia. Kennedy-Chamberlin, Inc. is a Delaware corporation whose physical assets are also located within the District of Columbia.

The Court having entered herein its findings of fact hereby makes and enters the following

## Conclusions of Law

1. Bellevue I and II are "close corporations." The defendants Chamberlin, Farnham, Free and Hixson, as majority stockholders, occupy to the plaintiffs a position similar to that of joint adventurers and partners. Where appropriate to accomplish the purposes of these actions, Bellevue I and Bellevue II may be considered as "chartered partnerships."

2. The defendants Chamberlin, Farnham, Free and Hixson have used the corporate forms of Bellevue I and Bellevue II to justify wrong and protect their improper acts. The court will therefore pierce the corporate veil of Bellevue I and Bellevue II and regard these corporations as associations of persons to the extent necessary to grant the plaintiffs appropriate relief.

3. All transactions between Bellevue I and Bellevue II on the one hand and Bellevue III, Bellevue IV and Kennedy-Chamberlin, Inc. on the other, during the period when the defendants Cham-

berlin, Farnham, Free and Hixson controlled the boards of directors of said several companies are presumptively fraudulent, and the burden is upon said defendants to show the entire fairness of each such transaction.

4. Inasmuch as the defendants have not sustained the burden of showing the entire fairness of the rental management contracts of February 3, 1955, between Bellevue I and Bellevue II on the one hand and Kennedy-Chamberlin, Inc. on the other, said contracts should be cancelled and set aside and the defendants should be enjoined from acting under them. The defendants Kennedy-Chamberlin, Inc. and the individual defendants should be required to account for and return to Bellevue I and Bellevue II, respectively, all moneys received by Kennedy-Chamberlin, Inc. as alleged "rental commissions" under said contracts, with interest from the respective dates on which said "rental commissions" were paid.

5. Inasmuch as the defendants have not sustained the burden of showing the entire fairness since February 3, 1955, of the arrangement by which Kennedy-Chamberlin, Inc. receives 100% of the gross rentals from furniture owned by it and used by it to furnish apartments in Bellevue I and Bellevue II, the defendant Kennedy-Chamberlin, Inc. and the individual defendants should be required to account for and pay over to Bellevue I and Bellevue II, respectively, amounts equal to 15% of all such furniture rentals received by Kennedy-Chamberlin, Inc. since February 3, 1955.

6. Inasmuch as the defendants have not sustained the burden of showing the entire fairness of the arrangement under which a rental office in Bellevue II's property is used partly for the benefit of Bellevue III and Bellevue IV without any compensation, the defendants Bellevue III and Bellevue IV should each be required to pay over to Bellevue II a fair proportion of the rental value of said office space since January 1, 1955.

7. Because of the systematic pattern of the wrongdoing by the individual defendants in their management of Bellevue I and Bellevue II, their wrongful conduct, bad faith and abuse of trust, their obvious hostility to the plaintiffs, and the likelihood that such conduct and hostility will continue, the court concludes that the assets of Bellevue I and Bellevue II should be liquidated, and that the net assets after payment of debts should be distributed among the stockholders (partners) in proportion to their respective interests.

8. Unless within thirty days from the entry of a judgment upon these findings of fact and conclusions of law the parties shall have filed a stipulation of settlement herein, the court, upon application of the plaintiffs, will appoint a receiver for the assets of Bellevue I and Bellevue II, with directions to sell or liquidate such assets, satisfy the corporate debts, and to distribute the net balance (after payment of necessary expenses of the receivership) among the stockholders of Bellevue I and Bellevue II, in proportion to their respective interests.

9. Plaintiffs are entitled to recover from Bellevue I and Bellevue II, respectively, their reasonable costs, expenses and attorneys' fees incurred in the prosecution of the derivative phase of these actions, to be paid out of the funds recovered for the account of Bellevue I and Bellevue II herein. Upon completion of sale of the assets of Bellevue I and Bellevue II by the receiver to be appointed herein, these actions should be referred to the Auditor to state the receiver's accounts and to recommend to the court appropriate allowances for plaintiffs' costs, expenses and attorneys' fees, and the expenses and allowances of the receiver.

10. The costs and expenses, and the fees of counsel for Bellevue I and Bellevue II in these actions should be paid by the individual defendants and may not be charged against Bellevue I and Bellevue II.