668 F.2d 1366
 215 U.S.App.D.C. 334
 Robert I. SCHATTNER, Doing Business as the R. Schattner
Company, Appellant,
v.
GIRARD, INC., an Illinois Corporation, et al.
Robert I. SCHATTNER, Doing Business as The R. Schattner Company
v.
GIRARD, INC., an Illinois Corporation, et al., Appellants.
 Nos. 80-2304, 80-2338.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 24, 1981.
Decided Nov. 6, 1981.
As Amended Nov. 12, 1982.
 
 Appeal from the United States District Court for the District of Columbia (D.C. Civil Action No. 80-00534).
 Alan R. Malasky, Washington, D.C., with whom Earl W. Kintner and James A. Kidney, Washington, D.C., were on brief for appellant Robert I. Schattner.
 Milton Eisenberg, Washington, D.C., with whom Andrea Newmark, Washington, D.C., was on brief for appellees Girard, Inc., et al.
 Before WRIGHT, WALD and MIKVA, Circuit Judges.
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 1
 The parties in this case appeal from different portions of a summary judgment entered by the district court on various commercial claims that have already been the subject of arbitration. We affirm, as we must, as to each claim and counterclaim that was or should have been determined in the arbitration. The district court also dismissed the portion of the complaint seeking equitable relief against the individual defendants who controlled the defendant corporation, holding that the corporate veil could not be pierced because plaintiff was himself a stockholder. We reverse that holding and remand for further proceedings.
 
 I. FACTS OF THE DISPUTE
 
 2
 Robert Schattner is a dentist and an inventor. He developed an oral disinfectant trademarked Sporicidin and entered a licensing agreement (Agreement) with defendant Girard, Inc. (Girard) on December 26, 1978. Girard was then entirely owned by Albert Bevilacqua, its president and chief executive officer, who had purchased the corporation some two months earlier. In payment for the license, Schattner was to receive ten percent of Girard's capital stock, $75,000 outright, and sixty-five percent of Girard's gross profits up to a maximum of six million dollars. Paragraph 6 of the Agreement stated that Bevilacqua and Joseph Rosano, Girard's vice president, would use their "best efforts to diligently promote the sale" of Sporicidin. Joint Appendix (J.A.) 42. The Agreement also provided that "all disputes arising in connection with this Agreement which the parties cannot adjust between themselves shall be finally settled by arbitration." P 13, J.A. 44.
 
 
 3
 Six months later, Schattner gave notice of intent to seek arbitration under the Agreement.[1] His only specific claim against Bevilacqua and Rosano was their failure to use their "best efforts" as required by P 6 of the Agreement. Girard counterclaimed in the arbitration, alleging that Schattner's fraud and misrepresentations had caused it to enter the Agreement. In February 1980, the arbitrators ruled that Girard had breached the Agreement, and awarded Schattner $596,000 for the period of Girard's obligations through December 31, 1979. Girard's counterclaim concerning Schattner's alleged misrepresentations was rejected. The third paragraph of the terse, eight-paragraph decision also stated: "No damages are awarded against the individuals Al Bevilacqua and Joseph G. Rosano." Award of Arbitrators, February 15, 1980, J.A. 52.
 
 
 4
 It had been apparent for some time that Girard would have difficulty paying Schattner's judgment.[2] When Schattner filed a complaint in the district court to confirm the arbitrators' award, he made several additional claims against Bevilacqua and Rosano. Three of the counts alleged that Bevilacqua and Rosano had tortiously interfered with Schattner's Agreement with Girard, had engaged in tortious misappropriation and conversion of Sporicidin, and had engaged in tortious acts of unfair competition. Schattner contended that these claims against the two individuals were not encompassed by the arbitration proceeding against Girard, and did not fall under the Agreement's provision that the individuals would use their "best efforts" to promote the sale of Sporicidin.
 
 
 5
 Schattner also asked the court to pierce the corporate veil of Girard and hold Bevilacqua and Rosano individually liable for the arbitrators' award.[3] Schattner alleged that he did not fully know the nature of the relationship between Bevilacqua, Rosano, and Girard, or the details of Girard's organization, financing, and control. Affidavit in Opposition to Defendants' Motion for Partial Summary Judgment, P 5, May 8, 1980, J.A. 67. He claimed that he viewed his relationship as a personal one between himself and the two individuals, and alleged that Bevilacqua had always assured him that Bevilacqua would stand behind Girard's obligations. Id. PP 6-7. Schattner argued that Bevilacqua, who still owned 90% of Girard's stock, had loaned the corporation more than $400,000 without a repayment schedule, failed to respect corporate formalities, undercapitalized Girard, and so dominated the corporation as to render it his alter ego.
 
 
 6
 Bevilacqua responded with two main counterclaims. First, he renewed the misrepresentation and fraud claim against Schattner that had been made by Girard in the arbitration. Bevilacqua contended that this claim was not encompassed by the arbitration because the Agreement had been largely between Schattner and Girard, because he was not in privity with Girard, and because he had suffered different actual damages than Girard. Bevilacqua also brought a securities claim against Schattner under section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1976), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (1981), contending that Schattner's wrongful acts had caused Bevilacqua to transfer 10% of Girard's stock to Schattner. Bevilacqua argued that the 10b-5 claim was not arbitrable because federal jurisdiction over such claims may not be waived, relying on Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).
 
 
 7
 On July 1, 1980, the district court granted crossmotions for summary judgment and in effect confirmed the arbitration award in toto. Order, July 1, 1980, J.A. 177. The court ruled that Schattner's tort claims against Bevilacqua and Rosano should have been submitted to arbitration as "disputes arising in connection with th(e) agreement," and that defendants' claims for fraud and misrepresentation and violations of federal securities law were precluded because they were "based on the exact same allegations of misrepresentation as were made before and rejected by the arbitrators." The court also ruled that Schattner, as a minority shareholder who contracted with full knowledge of Girard's corporate organization and financing, "is estopped to contend that his co-shareholder is liable for the debts of the corporation." Id. at 4-5, J.A. 180-81. It is this latter ruling that causes us to send this case back to the trial court.
 
 II. DISPOSITION OF THE APPEALS
 
 8
 A party whose claims have been decided in arbitration may not then bring the same claims under new labels. E.g., Goldstein v. Doft, 236 F.Supp. 730, 734 (S.D.N.Y. 1964), aff'd, 353 F.2d 484 (2d Cir. 1965), cert. denied, 383 U.S. 960, 86 S.Ct. 1226, 16 L.Ed.2d 302 (1966). The same is true of claims that should have been submitted to arbitration, even if they were not actually heard, for any other rule would allow parties to split their causes of action. See Brotherhood of Railroad Trainmen v. Atlantic Coast Line R. Co., 383 F.2d 225, 227 (D.C. Cir. 1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968). Although claims will not be barred unless they come within the scope of an arbitration agreement, see Davis v. Chevy Chase Financial Ltd., No. 80-1297 (D.C. Cir. October 15, 1981), the "strong federal policy in favor of voluntary commercial arbitration" requires that we not read the scope of such agreements too narrowly. Hanes Corp v. Millard, 531 F.2d 585, 597 (D.C. Cir. 1976).
 
 
 9
 Schattner's claims of unfair competition and interference with contract were effectively arbitrated and were correctly dismissed under this standard. See, e.g., Goldstein v. Doft, supra (claims of misrepresentation, inducement of breach of contract, and unjust enrichment cannot be litigated on tort theory when bases therefor already submitted to arbitration as part of claim for commissions due under contract); Ritchie v. Landau, 475 F.2d 151, 156 (2d Cir. 1973) (claim of fraudulent inducement dismissed on ground that plaintiff had fair opportunity to litigate claim in arbitration proceeding for breach of contract); Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd., 385 F.2d 158, 159 (2d Cir. 1967) (cause of action for "tort of conspiracy" held to be within arbitration clause because based on claims that arose from breach of contract). The basic facts underlying these tort claims are not distinguishable from the facts at issue in the arbitration. Similarly, Bevilacqua's misrepresentation and securities claims are precluded by the arbitrators' rejection of Girard's misrepresentation claim against Schattner. Bevilacqua is the dominant shareholder of a closely held corporation, and not only controlled and assisted Girard's litigation during the arbitration, but was also a party to that arbitration. See Drier v. Tarpon Oil Co., 522 F.2d 199, 200 (5th Cir. 1975); Kreager v. General Electric Co., 497 F.2d 468, 472 (2d Cir.), cert. denied, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974); Von Opel v. Brownell, 244 F.2d 789, 792-93 (D.C. Cir.), cert. denied, 355 U.S. 878, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957). It is also clear that an arbitration decision can have res judicata effect even if the underlying claim involves the federal securities laws. Moran v. Paine, Webber, Jackson & Curtis, 389 F.2d 242, 246 (3rd Cir. 1968); Davis v. Chevy Chase Financial Ltd., supra, slip op. at 24. Although a party is not required to arbitrate facts underlying a securities law claim, Wilko v. Swan, supra, once the facts underlying those claims are in fact arbitrated the decision of the arbitrators is binding. Gardner v. Shearson, Hammill & Co., 433 F.2d 367, 368 (5th Cir. 1970), cert. denied, 401 U.S. 978, 91 S.Ct. 1209, 28 L.Ed.2d 329 (1971).
 
 
 10
 Schattner's attempt to pierce the corporate veil of Girard requires entirely different analysis, however. It may be, as defendants suggest, that his attempt to do so stems entirely from the fact that Girard's financial straits make it unlikely that Schattner will recover the full judgment awarded by the arbitrators. But the apparent nature of Schattner's motive does not mean that his attempt must be barred; indeed, as Schattner points out, it was only when it became clear that Girard could not make good on the arbitration award that the issue of veil-piercing became ripe for consideration. Girard did not file for bankruptcy until after the completion of the arbitration. The district court also recognized the different nature of Schattner's veil-piercing claim. The court did not find the issue precluded by the arbitration, but instead held that Schattner was "estopped" to contend that his co-shareholder was liable for Girard's debts. Order at 4, J.A. 180.
 
 
 11
 We reverse because attempts to impose a strict barrier to suits by minority shareholders in this context are inconsistent with the flexible nature of a court acting in equity. The precedents in the District of Columbia will not support such a rigid rule. See, e.g., Eichelberger v. Arlington Building, Inc., 280 F. 997 (D.C. Cir. 1922); Bellevue Gardens, Inc. v. Hill, 190 F.Supp. 760 (D.D.C. 1960), aff'd, 297 F.2d 185 (D.C. Cir. 1961). Absolutely nothing in Boise Cascade Corp. v. Wheeler, 419 F.Supp. 98 (S.D.N.Y. 1976), aff'd, 556 F.2d 554 (2d Cir. 1977), or Namerdy v. Generalcar, 217 A.2d 109 (D.C. App. 1966), is to the contrary. These cases simply hold that a dominant shareholder will not be permitted to use the corporate form when it is to his advantage and drop that form when it is not.
 
 
 12
 Bevilacqua concedes that the rule articulated by the district court is more "qualified," Brief for Appellee Girard at 27, but contends that minority shareholders may seek to pierce the corporate veil only when the corporation has been formed or used for a fraudulent purpose. It is not relevant that Schattner has not alleged fraud with the requisite particularity in this case, however, because "(f)raud or other wrongful purpose is not a necessary element." Brunswick Corp. v. Waxman, 459 F.Supp. 1222, 1230 (E.D.N.Y. 1978), aff'd, 599 F.2d 34 (2d Cir. 1979). In Valley Finance, Inc. v. United States, 629 F.2d 162 (D.C. Cir. 1980), cert. denied sub. nom. Pacific Development, Inc. v. United States, --- U.S. ----, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981), we explained that "no uniform standard exists for determining whether a corporation is simply the alter ego of its owners," and that evidence of plain fraud, although of probative value, is "not a prerequisite." Instead, "(t) he test is a practical one, based largely on a reading of the particular factual circumstances." Id. at 172. See Francis O. Day Co. v. Shapiro, 267 F.2d 669, 673 (D.C. Cir. 1959); Harris v. Wagshal, 343 A.2d 283, 287-88 (D.C. App. 1975). We reject the overly narrow standard applied by the district court because a rule that minority shareholders may not seek to hold dominant shareholders liable for corporate debts would trap unwary creditors who might accept a few shares of stock as partial compensation for a debt. An unscrupulous sole shareholder might then successfully insulate himself from personal liability even in the most egregious situations, simply by taking care that each creditor owned some stock as an incidental part of any bargain. Such a rule would defeat the purposes of equity.
 
 
 13
 We express no sentiments as to the merits of Schattner's claim, of course. Veil-piercing is an extraordinary procedure that is not to be used lightly, and it is not yet clear whether this case presents the extreme circumstances that call for disregard of the corporate form.[4] Disposition by summary judgment was inappropriate, however, because substantial facts remained in dispute. See Nyhus v. Travel Management Corp., 466 F.2d 440, 442 (D.C. Cir. 1972). Despite conflicting affidavits, for example, the court found that Schattner had dealt with Girard "with full knowledge of the ownership, organization, financing, and management of the company." Order at 4, J.A. 180. We remand for additional proceedings as needed to give Schattner the opportunity to press his claim.
 
 
 14
 Schattner presses one additional but minor claim that should also be heard by the district court on remand. Some quantity of Sporicidin remained in Girard's hands following the termination of the licensing agreement, and the court properly granted Schattner summary judgment on his conversion claim for "whatever the amount is." Order at 5, J.A. 181. The court seemed to limit its relief to sales "between December 31, 1979 and February 15, 1980," id. at 4, J.A. 180, but defendants concede that additional sales of Sporicidin occurred as late as March 15, 1980. Supplemental Affidavit of Albert J. Bevilacqua, June 4, 1980, at 5, J.A. 158. The court's apparent decision to limit Schattner's damages to sales before February 15 may simply have been a clerical error. Nevertheless, the decision of the court should be extended to include an accounting for all sales by defendants of the licensed product after December 31, 1979, without a cutoff date.
 
 CONCLUSION
 
 15
 For reasons of judicial economy as well as the policies of federal law, courts tend to look askance at efforts to seek relief beyond that granted in arbitration proceedings. The rules of res judicata and collateral estoppel must govern our review of such proceedings if we are to advance the goal of promoting arbitration as an alternative to the complications and costs of litigation. See Revere Copper & Brass, Inc. v. Overseas Private Investment Corp., 628 F.2d 81, 83 (D.C. Cir.), cert. denied, 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980). Because arbitration is to be encouraged, courts appropriately uphold awards and preclude additional claims that were or should have been submitted to arbitration.
 
 
 16
 We remand this case only because the test adopted by the district court for piercing a corporate veil is unduly restrictive and does not promote the equitable principles that such a procedure is intended to advance. The better rule is that under appropriate circumstances a party is not precluded from piercing the veil of a corporation even though he is a minority shareholder. We remand for a determination of whether this is such an appropriate case.
 
 
 17
 It is so ordered.
 
 
 
 [1]
 The main thrust of Schattner's demand for arbitration was that Girard had entered a contract the previous January granting exclusive distribution rights for Sporicidin in the dental field to Unidisco, Inc. Schattner claimed that the Unidisco contract constituted a sub-license that could not have been granted without his approval, effected a tie-in between Sporicidin and three other Girard products contrary to the Agreement, and set a sales price of Sporicidin to Unidisco based on a discount that should have been added to gross income figures in calculating the periodic payment due to Schattner under the Agreement. The gravamen of Girard's counterclaim was that despite Schattner's representations, the American Dental Association had mistakenly issued a seal of approval for Sporicidin as a disinfectant capable of a 30-1 dilution
 
 
 [2]
 Schattner's Amended Complaint stated that Girard reported net losses for calendar year 1978 of more than $265,000, and that Schattner was unaware of this financial problem when he entered the Agreement. Amended Complaint P 6, J.A. 9. Girard filed for bankruptcy under Chapter 7 in July 1980. Brief for Appellees at 12
 
 
 [3]
 Schattner no longer presses this contention as to Rosano because it has developed that Rosano owns no stock in Girard. See Brief for Appellant Schattner at 16n.*. Accordingly, the text refers only to claims against Bevilacqua in this context
 
 
 [4]
 Bevilacqua notes that throughout the negotiations, Schattner pressed Bevilacqua and Rosano to make personal guarantees of Girard's $300,000 note, but that they resisted and Schattner settled for a note from Girard only. Brief for Appellees at 29. Schattner responds that he agreed not to press Bevilacqua for written guarantees when Bevilacqua explained that he simply did not want to have to disclose such a potential liability on future credit applications, and when Bevilacqua assured Schattner that he would in fact stand behind the obligations of Girard. Reply Brief for Appellant at 9 n.*. It is true, as defendants urge, that any such guarantees from Bevilacqua would have to be in writing to be enforceable. D.C.Code Ann. § 28-3502 (1973). That question is different, however, from whether Bevilacqua is liable as an alter ego of Girard. "Another example of disregarding corporate formalities is where stockholders have represented that they would be liable for their corporations' obligations, and are therefore estopped from denying liability." Brunswick Corp. v. Waxman, 459 F.Supp. 1222, 1230 (E.D.N.Y. 1978), aff'd, 599 F.2d 34 (2d Cir. 1979). Schattner is not to be rescued from a poor bargain, of course, but it may not be presumed on this record that Schattner bargained with a clear understanding of the distinction between Girard and Bevilacqua