**In re CAPITOL HILL HEALTHCARE GROUP D/B/A Capitol Hill Nursing Center, Debtor.**

**Bankruptcy No. 99–01801.**

United States Bankruptcy Court,
District of Columbia.

Dec. 13, 1999.

Marcia K. Docter, Docter, Docter & Lynn, P.C., Washington, DC, for Debtor.

Ralph S. Tyler, Hogan & Hartson L.L.P., Baltimore, MD, for Petitioning Creditor.

### DECISION RE DISMISSING INVOLUNTARY PETITION AND CASE

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The involuntary petition filed by NeighborCare–TCI, Inc. d/b/a NeighborCare–Richmond must be dismissed. The court adopts its oral decision of December 6, 1999, and supplements it as follows.

The court's thorough reading of the depositions in evidence and examination of the other exhibits convinces it that the debtor clearly is "a corporation that is not a moneyed, business, or commercial corporation" within the meaning of 11 U.S.C. § 303(a). Accordingly, pursuant to § 303(a), the debtor was not eligible to have an involuntary petition filed against it.

### I

Procedurally, the court set for trial the question of whether the debtor was eligible under 11 U.S.C. § 303(a) to have a petition filed against it and deferred trying the

other issues in the case. Although the debtor's motion to dismiss prompted the scheduling order setting the trial, the court rejects the petitioner's argument that the question tried was whether the debtor could demonstrate that the petitioner could prove no set of facts in support of its claim that it is entitled to relief. The court clearly singled out the § 303(a) issue for *trial;* this was not a hearing regarding whether facially the petition possibly presented a good case under the liberal construction rules that apply under F.R.Civ.P. 12(b)(6).

### II

The debtor, Capitol Hill Healthcare Group d/b/a Capitol Hill Nursing Center ("the Nursing Center"), and a sister corporation, Capitol Hill Community Hospital d/b/a Medlink Hospital at Capitol Hill ("the Hospital"), are registered as nonprofit corporations under District of Columbia law. As their names imply, they run, respectively, a nursing home and a hospital. They were organized for those purposes—specifically to provide long-term acute care that other hospitals in the community did not provide. Both entities are operated at the same site.

They make payments to a for-profit corporation, BHS Management, Inc. ("BHS"), for providing common services to the two non-profit corporations (for example, finance, patient accounting, housekeeping, security, and maintaining a cafeteria). In addition, the Nursing Center and the Hospital make rent payments to Capitol Hill Group ("CHG"), the owner of the real property they occupy.[1]

The Nursing Center and the Hospital were organized as nonprofit corporations under the California Mutual Benefit Corporations statute. Dr. Peter Shin is the sole member of the Hospital which in turn is the sole member of the Nursing Center.

---

**1.** The petitioner questions whether CHG is a non-profit corporation as CHG claims, but that issue is irrelevant to the status of the Nursing Home and the Hospital, and so the court will assume (without deciding) that CHG is a for-profit corporation.

Dr. Shin is the 100% shareholder of BHS, and also owns or controls CHG.

No evidence was presented to show that the payments to BHS and CHG are unreasonable in amount. In the case of BHS, it has simply been reimbursed for the expenses it incurs on behalf of the Nursing Center and the Hospital. Although it contractually is entitled to receive reimbursement of its costs plus 15%, the 15% has never been paid, and, in any event, no showing was made that a 15% commission would be unreasonable compensation to BHS. Nor was any showing made that the lease payments to CHG are unreasonable in amount. There simply was no showing that the payments to BHS and CHG are used as a subterfuge to route distributions to BHS, CHG, or Dr. Shin. Although Dr. Shin received a salary from BHS for which the Nursing Center and the Hospital reimbursed BHS, there was no showing that Dr. Shin's salary was unreasonable in amount.

The debtor and BHS have been operated as related entities, but this does not alter the debtor's true non-profit character. For example, the debtor, the Hospital, BHS, and CHG are treated as related entities—as essentially a single entity—under 42 C.F.R. § 413.17 for Medicare cost reimbursement purposes. Similarly, to minimize accounting fees, the Nursing Center, the Hospital, BHS, and CHG underwent a joint audit resulting in a single audit report. Although the report showed the combined effects of the entities' operations, nevertheless, the report included portions showing the results of the entities as separate corporations. Finally, the entities have also executed joint borrowing documents in order to obtain loans to the Nursing Center and the Hospital. All of this proved irrelevant because it failed to show that the separate existence of the non-profit entities is not fully respected or that the debtor should otherwise be viewed as operated for pecuniary gain.

The debtor has been operating at a loss. In 1997, the debtor reduced its number of charity cases to a relatively minimal level in comparison to 1996. Nor has the debtor ever sought to qualify with the Internal Revenue Service as a charitable organization. The court fails to see how any of these facts are relevant to whether the debtor is operated for pecuniary gain.

### III

■ The § 303(a) formulation of "moneyed, business, or commercial corporation" embraces only corporations organized for profit. *In re Allen University*, 497 F.2d 346 (4th Cir.1974) (applying phrase under the Bankruptcy Act); *Hoile v. Unity Life Ins. Co.*, 136 F.2d 133, 135 (4th Cir.1943) (same); *In re Caucus Distributors, Inc.*, 106 B.R. 890, 909–13, 915 (Bankr.E.D.Va.1989). To determine whether the debtor fits within the formulation, it is necessary to examine the corporation's charter of incorporation and its corporate activities. *Allen*, 497 F.2d at 347–48; *Hoile*, 136 F.2d at 135; *In re United Kitchen Assocs., Inc.*, 33 B.R. 214, 216 (Bankr.W.D.La.1983).

■ State law organization or registration as a non-profit corporation is not decisive. But such organization or registration is probative, and the petitioner failed to adduce any evidence establishing that the debtor is organized or conducted for profit despite its non-profit status under state law.

The debtor's mission is to provide health care to the community. The debtor has not issued stock. No distributions have been declared or made by the debtor on account of the membership interest of Dr. Shin.

■ The debtor's failure to seek to qualify as a charitable organization with the Internal Revenue Service, and its minimal charity cases, do not negate its non-profit status. Being a charity is not a prerequisite to not being a "moneyed, business, or commercial corporation" under 11 U.S.C. § 303(a).

■ Nor does the debtor's joining in joint borrowing documents and undergoing joint audits with BHS and CHG make the debtor a for-profit entity. Those activities do not establish that the debtor is conducted to earn a profit, as the borrowings are only for the benefit of the debtor and its sister non-profit corporation, the Hospital, and the joint audits minimized accountants' fees.

Finally, the debtor's payments to related entities have been on terms which the petitioner has not contended were unreasonable. No showing was made that the payments were a subterfuge for making distributions to Dr. Shin's through his for-profit corporations.

The court thus concludes that the debtor is not a "moneyed, business, or commercial corporation" under 11 U.S.C. § 303(a).

### IV

■ The petitioner, however, urges that the court should disregard the debtor's separate identity, specifically, that the debtor should be treated as the alter ego of BHS. Although the debtor and BHS share common control through Dr. Shin, such common control—for reasons discussed below—is insufficient standing alone to warrant treating the debtor as the alter ego of BHS clad with its for-profit status.

■ Treating a corporation as the alter ego of another entity is the same thing as piercing the corporate veil: it comes down to disregarding the corporation's separate existence. "Veil-piercing is an extraordinary procedure that is not to be used lightly." *Schattner v. Girard, Inc.*, 668 F.2d 1366, 1370 (D.C.Cir.1981). The petitioner has not shown any circumstances warranting the extraordinary remedy of piercing the corporate veil.

When a federal interest is at stake, the courts often bring to bear a more liberal federal common law of veil-piercing than applies when veil-piercing is sought in enforcing state tort or contract claims.

*United States through SBA v. Pena*, 731 F.2d 8, 12 (D.C.Cir.1984). For example, liberal veil-piercing is frequently brought to bear in regulatory contexts. *E.g., Capital Tel. Co. v. FCC*, 498 F.2d 734, 738 n. 10 (D.C.Cir.1974) ("Where the statutory purpose could be easily frustrated through the use of separate corporate entities a regulatory commission is entitled to look through corporate entities and treat the separate entities as one for purposes of regulation.") (citing *General Tel. Co. v. United States*, 449 F.2d 846, 855 (5th Cir.1971)). Thus, in *Capital Telephone* a license applicant and a sister corporation were treated as one and the same for purposes of a regulatory scheme barring a license grant to any entity which already had a license to broadcast in the area. *See also Quinn v. Butz*, 510 F.2d 743 (D.C.Cir.1975) (straw vice president allowed to show that corporation was alter ego of president such that the vice president ought not be treated as "responsibly connected" with the operation—by virtue of his vice president status—for purposes of agricultural commodities regulatory statute). But the petitioner has failed to show any regulatory scheme at stake here which would warrant using a liberal doctrine of piercing the corporate veil.

■ Applying the federal common law of corporate veil-piercing to 11 U.S.C. § 303(a) yields the result that § 303(a) embodies a federal policy that only a truly non-profit corporation should be allowed to be exempt from involuntary petitions as a non-moneyed corporation. But the case law examined in part III above already incorporates that test, and the court's application of that case law has already demonstrated that the debtor is truly a non-profit corporation.

■ That the debtor and BHS are treated as related organizations for Medicare disbursement purposes under 42 C.F.R. § 413.17 is wholly irrelevant to the application of 11 U.S.C. § 303(a). Treating them as related organizations for a

federal reimbursement program is precisely the type of regulatory arena in which the separate existence of the entities may be disregarded for statutory purposes. That entities are a single economic unit under Medicare cost reimbursement regulations does not carry over to determinations under 11 U.S.C. § 303(a).[2]

Declaring a corporation to be an alter ego is only available "as the justice of the case may require." *Quinn v. Butz,* 510 F.2d at 757, quoting *Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n,* 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918). Penetration of the corporate veil, in other words, is a device for which "the ultimate principle is one permitting its use to avoid injustice." *Quinn,* 510 F.2d at 759. Thus, courts have "disregarded the corporate fiction where its recognition would pervert the truth." *Quinn,* 510 F.2d at 758 (footnote omitted). Regardless of what formulation of the alter ego doctrine may be used, the bottom line in this case is that the petitioner has utterly failed to articulate any injustice (for example, a perversion of the truth) which would arise by respecting the debtor's separate corporate existence. The debtor has done nothing improper, its separate existence was in no way an attempt to circumvent § 303(a), and respecting its separate existence visits no injustice on the petitioner.

In urging application of the alter ego doctrine, the petitioner has principally pointed to Dr. Shin's control of the debtor, the Hospital, BHS, and CHG. That alone does not establish an injustice as required by *Quinn* to pierce the corporate veil.

Indeed, it has long been the clearly stated rule in this circuit that the existence of a sole and controlling share-

holder does not alone justify invoking the alter ego doctrine, however that doctrine might be formulated. The doctrine of alter ego is brought to bear only upon a showing *"not merely of single ownership, or of deliberate adoption and use of a corporate form in order to secure its legitimate advantages,* but of such domination of a corporation as in reality to negate its separate personality" in circumstances in which "at some innocent party's expense, the corporation is converted into such an instrumentality," with the result that the corporate identity is disregarded "as the justice of the case may require." *Quinn,* 510 F.2d at 758 (emphasis added). As observed more recently in *Valley Finance, Inc. v. United States,* 629 F.2d 162, 171–72 (D.C.Cir.1980), cert. denied, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981):

> The concept of distinct corporate entity has long served useful business purposes, encouraging risk-taking by individual investors as well as overall convenience of financial administration. Ordinarily, such considerations justify treating the corporation as a separate entity, independent of its owner. On occasion, however, this concept is abused, and yields results contrary to the interests of equity or justice. Courts have not hesitated to ignore the fiction of separateness and approve a piercing of the corporate veil when the corporate device frustrates clear intendment of the law. . . .
>
> Given the diversity of corporate structures and the range of factual settings in which unjust or inequitable results are alleged, it is not surprising that no uniform standard exists for determining whether a corporation is simply the alter ego of its owners. *The fact of sole own-*

2. Nor is it relevant to application of 11 U.S.C. § 303(a) that for labor law or employee discrimination law purposes entities may be deemed to constitute "an integrated enterprise" as discussed in *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) (entities treated as single employer for labor law purposes); *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir.1983) (entities treated as single employer for purposes of employment discrimination law).

*ership is not by itself sufficient,* although it is certainly not irrelevant.

To recapitulate, what is clear from *Valley Finance* and from *Quinn* is that beyond a sole controlling shareholder there must be some showing of an injustice—for example some wrong or abuse—arising from the fiction of separate corporate existence.[3] To paraphrase *Valley Finance,* the alter ego doctrine ought not be applied here because respecting the debtor as a separate entity would neither abuse the concept of corporations being distinct entities; nor yield results contrary to the interests of equity or justice; nor frustrate the clear intendment of 11 U.S.C. § 303(a).

Plainly, 11 U.S.C. § 303(a) embodies no policy akin to a regulated industry scheme which warrants disregarding a debtor's separate existence simply because there is common control of the debtor and a related entity that has provided services to the debtor on reasonable terms.

---

**3.** As stated long ago by this circuit's court of appeals:

> [T]here is an exception to the entity rule, where its recognition would result in promoting illegality, fraud, or injustice. In other words, since the franchise is granted by the state for a useful and valid purpose, it may not be employed to further wrong. Where it is so employed the law will disregard the rule, go behind the fiction, and treat the stockholders as if the corporation did not exist.

*Eichelberger v. Arlington Bldg., Inc.,* 280 F. 997, 999 (D.C.Cir.1922) (citations omitted).