ITT ARCTIC SERVICES, INC.

v.

The UNITED STATES.

No. 324–73.

United States Court of Claims.

Oct. 22, 1975.

C. Stanley Dees, Washington, D. C., for plaintiff. Gilbert A. Cuneo, Washington, D. C., atty. of record. William H. Butterfield, Sellers, Conner & Cuneo and William Eisner, Paramus, N. J., of counsel.

Susan M. Linden, Court of Claims Section, Civil Div., Dept. of Justice, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffee, for defendant.

Before DURFEE, Senior Judge, and NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DURFEE, Senior Judge.

The legal task before the court is one of interpreting the parties' contract. The question to be answered is whether certain clauses in the parties' contract entitled plaintiff to a price increase in its Firm Fixed-Price (FFP) contract for increased costs incurred in Canada on account of the Canadian Government's action in unpegging the fixed rate of exchange between the American and Canadian dollars and the latter currency's upward float in value during the life of the parties' contract.

The Armed Services Board of Contract Appeals (the Board) having denied plaintiff's claim[1] for a price increase in its FFP contract, the case comes before this court on plaintiff's motion and defendant's cross-motion for summary judgment. Plaintiff seeks reversal and defendant affirmance of the Board's decision under the review standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970). The appeal presents solely a question of law without dispute to the operative facts.

ITT Arctic Services, Inc. (ITT-ASI),[2] an American corporation, had provided operation and maintenance (O & M) services under a series of successive management contracts with the United States Air Force on the Distant Early Warning Line (DEW Line) since its completion in 1955. The DEW Line is a network of radar and communication installations extending across large areas of the Arctic regions including Canada, Alaska and Greenland. The DEW Line's primary objective is the detection, classification and reporting of airborne objects. The present dispute involves only the Canadian portion of the DEW Line.

ITT-ASI received its first DEW Line O & M contract for fiscal year 1957. This contract was a Cost Plus Fixed Fee (CPFF) contract and renewed annually up to 1963. For fiscal years 1964 through 1966 plaintiff operated the DEW Line under a Cost Plus Incentive Fee (CPIF) contract. Between fiscal years 1967–1969, ITT-ASI performed O & M services on the Canadian segment of the DEW Line under a Fixed-Price Incentive Fee (FPIF) type contract. Following the issuance and evaluation of a competitive two-step multi-year Request for Proposals (RFP)[3] issued by the Air Force through the Sacramento Air Materiel Area, McClellan Air Force Base, California, plaintiff was awarded a three-year DEW Line O & M manage-

---

1. ITT Arctic Services, Inc., ASBCA No. 15630, 72–1 BCA ¶ 9188.

2. ITT Arctic Services, Inc. is the successor by corporate reorganization and contract novation agreement dated October 1, 1969 to Federal Electric Corporation, the original awardee of the present contract, and a wholly-owned subsidiary of International Telephone and Telegraph Company.

3. RFP No. FO 4606–69–R–0131.

ment services contract, effective July 1, 1969 for fiscal years 1970, 1971 and 1972. That contract,[4] the basis of the present dispute, was a Firm Fixed-Price (FFP) type contract with a monthly payment in U.S. dollars of $1,696,319 for a total contract price of $61,067,484. The contract's Statement of Work (SOW) provided that in addition to performing the technical operation, maintenance and support services necessary for the actual operation of the DEW Line, the contractor (ITT–ASI) would provide a wide variety of auxiliary services to its DEW Line employees including recreational and morale programs and religious, mail, medical and mortuary services.

Prior to the award of the first O & M DEW Line contract, the Governments of the United States and Canada entered into agreements governing the performance of O & M contractors on the Canadian segment of the DEW Line. These intergovernmental agreements provided that U.S. selected DEW Line contractors would give preference to Canadian labor, set and maintain wage rates and working conditions after consultation with and approval by the Canadian Department of Labour in accordance with the Canadian Fair Wages and Hours of Labour Act, and pay its Canadian labor in their domestic currency (Canadian dollars).

The United States Government assured compliance with these provisions of the U.S.-Canadian agreements by inserting in all DEW Line contracts a clause requiring contractor adherence with all U.S.-Canadian agreements. The Special Provision's Clause in plaintiff's present contract required:

### PART V AGREEMENTS BETWEEN GOVERNMENTS

The Contractor shall comply with the applicable provisions of any agreements heretofore or hereafter entered into between the Government of the United States and the Governments of Canada, Denmark, Iceland or the Unit-ed Kingdom, as well as the Air Force Regulations, manuals and other applicable directives in existence on the date of the execution of this contract. In the event that any provisions of said agreements are inconsistent with the terms and conditions of this contract, this contract shall be amended accordingly. Such amendments, however, shall be subject to the provisions of ASPR 1–109.4.

On May 31, 1970 the Canadian Government removed the fixed par value of its currency, and allowed the Canadian dollars to float in the international money market. For the preceding eight years the Canadian dollar had a fixed par value exchange rate of .925 to the U.S. dollar. After the termination of Canada's fixed exchange rate the Canadian dollar fluctuated upward in value against the U.S. dollar. While floating the Canadian dollar never dipped below the previously fixed exchange rate of .925 to the American dollar. The effect of the unpegging action was that plaintiff had to exchange more U.S. dollars, in which it was paid, in order to obtain sufficient Canadian currency in which to meet its required Canadian obligations.

It is undisputed that the subsequent rise in the value of the Canadian dollar occasioned by that Government's decision to float its currency increased plaintiff's cost in meeting its contract expenses. The parties agree that the negotiations and plaintiff's computation of its price proposal regarding this contract were based on the then fixed Canadian rate of exchange of .925 to the U.S. dollar, *and that there were no discussions of a change in that rate.*

On June 5 and July 24, 1970 plaintiff requested from the Contracting Officer an upward price adjustment in its FFP contract on account of the adverse impact the higher cost of Canadian dollars was having on its cost position. Plaintiff based its request on paragraph 3 of Part IV of the Special Provisions. That part of the Special Provisions provided:

---

4. Contract No. FO 4606–69–C–1108.

PART IV AGREEMENTS BETWEEN GOVERNMENTS OF THE UNITED STATES AND CANADA:

1. The Contractor shall comply with all applicable Government agreements relating to Canadian participation in the operation and maintenance of the Canadian segment of the DEW Line. These agreements call for the exclusive use of Canadian sources in procuring petroleum, oils and lubricants, and transportation by air or water. However, it being understood that the POL requirements may be procured outside of Canada if costs quoted by Canadian Companies substantially exceed costs of POL which may be offered by other sources. In addition the Contractor shall accord preference to qualified Canadian Materials.

2. Wages Canadian Portion—The Wages applicable to that portion of the work to be performed in Canada must be approved by the Canadian Department of Labour. This includes the number of hours per work week as well as wage rates.

3. Wage Escalation—[hereinafter Wage Escalation clause] In the event that labor costs including fringe benefits, working conditions, or other elements of labor costs increase in Canada during the period of 69 Jul 01 through 72 Jun 30 which are in excess of those in effect as of 69 Jul 01, such increases, when required and approved by the Canadian Government will be the basis for modification of the contract price. Such increase shall not include any amount for general and administrative costs, overhead or profit nor shall an adjustment be allowed by reason of improper classification of employees.

The Contracting Officer denied plaintiff's request. On timely appeal to the Armed Services Board of Contract Appeals, the Board affirmed the Contracting Officer concluding that:

Our conclusion is that while appellant may have incurred additional costs attributable to currency fluctuation, such costs in our opinion could not be deemed "labor costs" or "other elements of labor costs" under the wage escalation clause of the contract.[5]

■ Plaintiff filed a petition in this court on August 28, 1973 for review of the Board's decision under both sections of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970), alleging that the decision of the Armed Services Board of Contract Appeals was erroneous as a matter of law.[6]

Plaintiff claims that the Board erred in not interpreting the Wage Escalation clause, set forth above, as applicable to the present situation to grant plaintiff an upward price modification for the increased costs incurred on the instant contract on account of the rise in the exchange rate between the Canadian and American dollars. The Government takes the opposite view that the Board should be affirmed because it properly concluded that the Wage Escalation clause was not intended to protect plaintiff against losses due to currency fluctuations.

For the reasons below, the Government's position is sustained, and its cross-motion for summary judgment granted. Plaintiff's motion for summary judgment is denied, and its petition dismissed.

■■ Contract interpretation questions of the meaning and applicability of

5. 72–1 BCA ¶ 9188 at 42,597.

6. While plaintiff in its Motion for Summary Judgment (Pltf's M. for S.J. 1–2) makes a general assertion of possible factual deficiencies in the Board's decision, it makes no specific identifiable charges of factual error. Without such specific supported demonstration of factual Board error the Board's statement of facts will be accepted. *Jefferson Constr. Co. v. United States,* 368 F.2d 247, 252, 177 Ct.Cl. 581, 589 (1966).

a contract clause, such as the present one, require the court's determination as to what the parties shook hands on. "For it is always true that 'in the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties.' 4 Williston, Contracts § 601 (3d ed. 1961) [other citations omitted]." *Dynamics Corporation of America v. United States,* 389 F.2d 424, 429, 182 Ct.Cl. 62, 72 (1968). The rules governing such contract interpretation, the sole issue in this case, are well settled and without need of elaborate reiteration. In attempting to give effect to the contracting parties' intent, the court is guided by the principles that "[t]he parties' intent must be gathered from the instrument as a whole." *Kenneth Reed Constr. Corp. v. United States,* 475 F.2d 583, 586, 201 Ct.Cl. 282, 288 (1973), preferably giving a reasonable meaning to all parts of the instrument rather than leaving a portion of it useless, *Martin Lane Company, Inc. v. United States,* 432 F.2d 1013, 1019, 193 Ct.Cl. 203, 215 (1970), from the perspective of "a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States,* 444 F.2d 547, 551, 195 Ct.Cl. 21, 30 (1971), and ascribing to the contract language "its ordinary and commonly accepted meaning", *Hol-Gar Manufacturing Corp. v. United States,* 351 F.2d 972, 976, 169 Ct.Cl. 384, 390 (1965), without twisted or strained out of context analysis, *Aero Mayflower Transit Co. v. United States,* 162 Ct.Cl. 233 (1963), or regard to the subjective unexpressed intent of one of the parties. *Dana Corp. v. United States,* 470 F.2d 1032, 1041, 200 Ct.Cl. 200, 214 (1972); *John C. Kohler Co. v. United States,* 498 F.2d 1360, 1365, 204 Ct.Cl. 777, 787 (1974).

■ Further, both parties are presumed to possess elementary commercial intelligence, *Franklin Co. v. United States,* 381 F.2d 416, 180 Ct.Cl. 666 (1967), and "approach their undertaking with a reasonably clear understanding of the attendant complexities and consequences." *Massachusetts Port Authority v. United States,* 456 F.2d 782, 784, 197 Ct.Cl. 721, 726 (1972).

■ In the event of multiple reasoned opposing views of a contract clause, the interpretation of the non-drafting party will prevail. *Kenneth Reed Constr. Corp. v. United States,* 475 F.2d at 588, 201 Ct.Cl. at 289. The court's "ultimate goal is always to give full force and effect to the expressed or implied intentions of the contracting parties." *Massachusetts Port Authority v. United States,* 456 F.2d at 784, 197 Ct.Cl. at 726.

■ Application of these principles leads to the conclusion that in assessing the surrounding circumstances and contract language, the Wage Escalation clause was not intended to protect plaintiff from currency exchange rate fluctuations.

Throughout plaintiff's thirteen-year contractual performance on the DEW Line, it was continuously subject to the Canadian Government's exercise of its power to upwardly adjust plaintiff's labor costs. The parties negotiated all their DEW Line O & M contracts with the awareness that under a prior U.S.-Canadian agreement predating the first DEW Line O & M contract[7] and implementing contract clauses appearing in every such contract since 1957, plaintiff was obligated to accede to the directives of Canadian authorities with regard to their Canadian labor's wages and various other benefits. The parties negotiated their presently disputed contract with a

---

7. The relevant part of that U.S.-Canadian agreement was set forth in the Board's Findings of Fact:

"The 5 MAY 1955 agreement between the United States and Canadian Governments required that preference be given to Canadian labor for construction in Canada; and that:
' * * * The rates of pay and working conditions for this labour will be set after consul-

tation with the Canadian Department of Labour in accordance with the Canadian Fair Wages and Hours of Labour Act.' " 72–1 BCA ¶ 9188 at 42,592.
While the above provision of the U.S.-Canadian agreement initially applied only to the construction of the DEW Line, it was extended in July 1955 to apply also to the operation of the DEW Line.

fuller awareness that Canadian authorities could increase plaintiff's costs by increasing its Canadian labor's wages, but without regard, as the parties admit, to the potentiality of an increase in the U.S.-Canadian currency exchange rate. The parties' awareness of the Canadian Government's unilateral power under the prior Canadian-American DEW Line agreement, contractually incorporated in plaintiff's contract, to adversely affect plaintiff's labor costs was born of recent practical experience. Only four years prior to the execution of the parties' instant contract, plaintiff had to petition the Board for price relief stemming from the Canadian Government's refusal to approve plaintiff's proposed Canadian wage rates in the parties' contract for fiscal years 1964–1966. In that case, *Federal Electric Corporation,* ASBCA No. 9476, 65–1 BCA ¶ 4747, plaintiff's Cost Plus Incentive Fee contract did not contain a provision for escalation of the contract price for the Canadian Government's increase in plaintiff's labor costs. The Board could find no contractual basis for awarding plaintiff relief, but nonetheless adjusted plaintiff's incentive fee formula to effect the parties' Cost Plus Incentive Fee contractual intent that the contractor not lose a large portion of its proposed target fee upon the occurrence of a particular event beyond the control of either party.

The Wage Escalation clause, Special Provisions Part IV, paragraph 3, *supra,* first appeared in the parties' next contract immediately following the Board's *Federal Electric Corporation* decision in the parties' contract for fiscal years 1967–1969. Its appearance immediately following the end of litigation over contractor's relief for Canadian-imposed upward adjustments in plaintiff's Canadian wage rates indicates the parties' intent to contractually protect plaintiff from certain increases. The clause's timely appearance specifically reflects the parties' intent to protect plaintiff from those increases which could adversely affect plaintiff's cost position over a multi-year contract from actions of the Canadian Government which with respect to rates of pay and working conditions that Government exercised unrestricted, unilateral control over by the prior American-Canadian agreement and binding on plaintiff by appropriate contract clauses. Such is the purpose of an escalation clause as described by the Armed Forces Procurement Regulations:

> § 3.404–3 Fixed-price contract with escalation.
>
> (a) *Description.* The fixed-price contract with escalation provides for the upward and downward revision of the stated contract price upon the occurrence of certain contingencies which are specifically defined in the contract. * * * [8]

At the time of the introduction of the Wage Escalation clause the only certain contingency specifically confronting the parties was the Canadian Government's adjustment of plaintiff's Canadian labor's wages and benefits. The U.S.-Canadian currency exchange rate had remained unchanged for over eight years. There is no evidence of discussions between the parties at the time of the introduction of the Wage Escalation clause in 1967 of a change in the then existing currency exchange rate, and the parties admit that during negotiations for the present contract neither party raised the possibility of a U.S.-Canadian currency exchange rate change nor discussed Parts IV and V of the contract's Special Provisions. Further evidence of the parties', and plaintiff's in particular, disregard for the possibility of a currency exchange rate change is the elimination of a protective Foreign Exchange provision, included in the parties' contract for fiscal years 1967, 1968 and 1969, from the presently disputed contract. That Foreign Exchange provision applied only to computation of plaintiff's incentive fee, and was appropriately eliminated when the parties switched from an incentive fee type contract to a Firm

---

8. 32 C.F.R. § 3.404–3(a) (1969).

Fixed-Price contract. Plaintiff formerly insisted on a protective Foreign Exchange clause to guard against currency exchange rate diminutions of its incentive fee to protect only its incentive fee in that type of contract, which also contained the present Wage Escalation clause, where without it, plaintiff stood to lose only a portion of its fee (profit). Plaintiff's failure to insist on the same type of protective clause under its FFP contract where, without such a clause, plaintiff stood to lose not only its entire profit, but also part of its costs, is indicative of a lack of concern over the possibilities of an adverse currency exchange rate fluctuation.

The language of the disputed contract clause(s) is directly in line with and protectively implementative of the parties' recognized contingency of action by the Canadian Government raising the wage levels or benefits of plaintiff's Canadian labor, and correspondingly contrary and unimplementative of an intent on the part of the parties to include therein currency exchange rate fluctuation protection.

Part IV of the parties' contract's Special Provisions is captioned "AGREEMENTS BETWEEN GOVERNMENTS OF THE UNITED STATES AND CANADA" and contains three paragraphs. Owing to the specific caption of this Special Provision's part, the paragraphs included therein must be read as setting forth the parties' understanding as to their respective contractual obligations regarding U.S.-Canadian agreements.

The first paragraph of this part, *supra,* provided that:

"1. The Contractor shall comply with all applicable Government agreements relating to Canadian participation in the operation and maintenance of the Canadian segment of the DEW Line.
\* \* \*"

The remainder of the paragraph deals with certain DEW Line materials and specifies that U.S.-Canadian agreements call for exclusive use by the contractor of Canadian source petroleum, oils, and lubricants (POL) and air or water transportation. In addition, the contractor was to accord preference to qualified Canadian materials. The paragraph also provides a price escape mechanism from the Canadian POL exclusive use requirement by providing that the contractor's "POL requirements may be procured outside of Canada if costs quoted by Canadian Companies substantially exceed costs of POL which may be offered by other sources." Thus, in the event of substantial price increases in Canadian POL products, the contractor could avoid such adverse impact on its contract costs which, absent such a provision, it would be obligated to absorb by the prior U.S.-Canadian agreement regarding DEW Line supplies incorporated in its contract by resort to other non-Canadian POL sources. The paragraph is specifically tailored to provide for plaintiff's exclusive use of Canadian POL supplies necessitated by a U.S.-Canadian agreement to the same effect yet provides relief to the contractor to escape the burden of the exclusive use Canadian-POL requirement if such prices should substantially increase in Canada during the life of its contract.

Paragraph 2 under the agreements between the Canadian and American Governments' Special Provisions part of the parties' contract deals with plaintiff's Canadian labor obligations. That paragraph acknowledges the Canadian Government's control of the wage rates and working conditions of plaintiff's Canadian labor, and specifies plaintiff's obligation under its contract to abide by the prior intergovernmental agreement, and set and maintain its Canadian labor's wage rates, working conditions and assorted other benefits in accord with the directives of the Canadian Department of Labour. Unlike the preceding paragraph, paragraph 2 contains no relief mechanism to aid plaintiff in the event of a Canadian-imposed wage increase or upward adjustment in the cost of related benefits. Absent such a provision, plaintiff would be at a serious cost disadvantage on its multi-year FFP contract should the Canadian Government

exercise its right under the prior U.S.-Canadian agreement to adjust upward the wage rates or working conditions of plaintiff's Canadian labor over the life of the parties' contract. The effect of plaintiff's bargain to perform DEW Line O & M services, 90 percent of the costs of which are labor costs, on a firm fixed-price basis, coupled with its relinquishment of control over various labor cost items to Canadian authorities, directly subjected plaintiff to the risks of uncontrollable labor costs increases which, due to its contractual agreement to be bound by such increases, could have a disastrous impact on plaintiff's earnings.

Confronted with such foreseeable risks of predictable adverse impact, one would reasonably expect the novice, let alone the experienced contractor, to protect itself against the consequences of unavoidable third-party increases in its labor costs.

Paragraph 3 of Part IV of the parties' contract's Special Provisions was obviously designed to obviate such risks the same as the escape mechanism in paragraph 1 of the same part regarding plaintiff's exclusive use requirement of Canadian POL products. Paragraph 3 in material part provides that:

> 3. Wage Escalation—In the event that labor costs including fringe benefits, working conditions, or other elements of labor costs increase in Canada [during the life of the parties' contract] such increases when required and approved by the Canadian Government will be the basis for modification of the contract price. * * *

Paragraph 3 following as it does the paragraphs dictating that plaintiff shall observe all U.S.-Canadian agreements, and specifically setting forth plaintiff's obligation to observe Canadian control of its wage rates, and other identifiable labor costs in its contract's Special Provisions part concerning agreements between those two Governments leads to the conclusion that the labor costs referred to are only those under the direct control of the Canadian Government by virtue of the prior U.S.-Canadian agreement.

The clause contains other indications of this same conclusion. Paragraph 3 is titled Wage Escalation. Control of wage levels by virtue of both the prior U.S.-Canadian agreement and paragraph 2 are in the exclusive province of Canadian authorities. The general terms "labor costs" and "other elements of labor costs" are refined by the more specific terms "fringe benefits" and "working conditions". Again, both the prior U.S.-Canadian agreement and the parties' contract place control of these specific labor costs elements in the unrestricted hands of the Canadian Government. Finally, paragraph 3 specifies that to be the basis of a contract price modification, any labor cost increases must be "required and approved by the Canadian Government." Such a restriction undeniably and restrictively limits potential contract price modification labor cost increases only to those within the unrestricted and unilateral power of the Canadian Government to effectuate. The only labor cost increases undeniably and unrestrictively within the control of the Canadian Government to impose upon plaintiff were cost increases in the levels of plaintiff's Canadian labor's wages, fringe benefits and working conditions unconditionally surrendered to Canadian control under the American-Canadian agreement.

Cost increases due to currency exchange rate fluctuations resulting from the Canadian Government's action in unpegging the fixed American-Canadian currency exchange rate were not cost increases the Canadian Government could unilaterally impose upon plaintiff under U.S.-Canadian agreement. No such intergovernmental agreement existed regarding the maintenance or adjustability of the Canadian-American currency exchange rate. Neither were they cost increases which the Canadian Government could require or control unilaterally. Exchange rate increases in an international floating currency are not

within the sole control, approval or direction of the floating country.

The net result of objectively examining the contemporary circumstances giving rise to the Wage Escalation clause, is uncritical inclusion in the presently disputed contract, and the language of the clause, supports the conclusion that the parties reasonably intended to relieve plaintiff of the risks of labor cost increases attendant to the Canadian Government's exercise of the control under prior U.S.-Canadian agreements to raise the cost of plaintiff's Canadian labor. Such labor costs were, however, limited to only those which plaintiff had contractually surrendered control of to Canadian authorities pursuant to such an agreement, and accordingly, do not include increased floating currency costs.

Plaintiff's primary contention is that the common ordinary meaning of the contract clauses in Part IV of the Special Provisions entitles it to an upward price modification. Subsidiary to this argument is plaintiff's assertion that the Government's interpretation of the contract clauses denying plaintiff relief is unreasonable or alternatively conceding the reasonableness of the Government's interpretation, plaintiff should still prevail under the rule of *contra proferentem*. In addition, plaintiff argues that it is entitled to relief even without Part IV, paragraph 3 of the Special Provisions of its contract. Apparently, as an afterthought, plaintiff, in its last submission to the court, urges the court to reform its contract on the basis of mutual mistake of fact.

As the prime basis for its recovery, plaintiff asserts that the broad language of the Wage Escalation clause stands for the unqualified proposition that whenever resultant to an act of the Canadian Government plaintiff's cost of paying its employees increases, plaintiff is entitled to an upward contract price modification. Such an interpretation of the Wage Escalation clause we find to be cumulatively unreasonable, unsupported by the contract language, and contrary to the parties' intent.

A survey of the prevailing contemporary circumstances, both from the commencement of plaintiff's DEW Line O & M contract performance, and at the inception of the Wage Escalation clause discloses the parties' overriding concern for the Canadian Government's control over the cost of wages and related labor benefits that plaintiff must pay under its contract agreement, and coincidentally, no concern whatever for fluctuations in the Canadian currency exchange rate or its impact on plaintiff's costs. Plaintiff ignores this limited protective consideration, and its acquiescence in it in postulating that merely because it paid an increased price for Canadian dollars with which to pay its Canadian labor, the same is an increased labor cost entitling plaintiff to a contract price modification. Rather, plaintiff seeks to support its position by focusing on the wording of paragraphs 2 and 3 of Part IV of the Special Provisions. Plaintiff points out that paragraph 2 speaks in terms of "wages" and the "Canadian Department of Labour," while paragraph 3 refers to "labor costs" and actions by the "Canadian Government." By comparing these two paragraphs, plaintiff asserts that paragraph 3, the Wage Escalation clause, is broader than paragraph 2, and intended to cover more than wage increases. We agree, as does defendant, that the Wage Escalation clause in Part IV of the Special Provisions is broader than paragraph 2 of that same part, and intended to cover more than wage increases. However, we do not agree with plaintiff's deduction that paragraph 3 being broader than paragraph 2, the former paragraph was intended to cover *any* increase in the cost of paying plaintiff's Canadian employees resulting from Canadian Government action, or that the common, ordinary meaning of the Wage Escalation clause includes protection for currency exchange rate fluctuations.

Plaintiff's assertion that its expense of independent currency transactions to secure Canadian dollars to pay both for Canadian labor and materials transforms

a portion of that expense into labor costs must be rejected as unsupported by persuasive reason.

We see no reasoning, other than that of a strained variety, to logically accept plaintiff's argument that any cost of paying its Canadian labor must redoubtably be a labor cost. Plaintiff relies on the attenuated logic that a "cost" is something incurred by an employer, hence, plaintiff's cost of Canadian dollars with which to pay its Canadian labor must be a labor cost. Plaintiff points to no supportive reasoning or authority that any costs a business concern may incur in paying its employees are definitely labor costs alone. Under plaintiff's argument, the cost of check paper, bookkeeper's ink, computer data or a host of other goods and services utilized toward seeing that a laborer receives his wages would to plaintiff constitute a labor cost. Such a position cannot be sustained as reasonable or supported by the contract language. In fact, the Wage Escalation clause specifically excludes from labor cost increases entitling plaintiff to a contract price modification "any general and administrative costs, overhead or profit." In doing business in a foreign country, the purchase of that country's currency to meet contractor's local obligations is an expense attributable to the overall operation of the concern, and not naturally or reasonably attributable alone to either the cost of labor or supplies. Rather, the cost of currency ultimately expended for both of these items and other necessary elements of a business operation more reasonably must be classified as a general expense as the incurrence of the currency cost is of both general and necessary benefit to all phases of an international contractor's operations.

Even accepting plaintiff's strained reasoning that the cost of Canadian currency must be considered a labor cost, and ignoring the Wage Escalation clause's specific prohibition against the inclusion of general expenses in the computation of labor cost increases eligible for contract price modifications under that clause, plaintiff's asserted right to a contract price modification under the Wage Escalation clause is defeated by the explicit language of that clause. The Wage Escalation clause specifies that only those labor cost increases "required and approved" by the Canadian Government will be the basis of a contract price modification. This language restricts consideration of a contract price modification for increased labor costs to those increases mandated by the Canadian Government, and requires a showing that the Canadian Government directed an increase in plaintiff's cost of labor.

Plaintiff's increased currency costs resulted from the Canadian Government's decision to eliminate the fixed rate of exchange for the Canadian dollar, and that currency's subsequent rise in exchange value. That decision to remove the fixed exchange rate between the U.S. and Canadian dollars opened three distinct possibilities. The Canadian dollar after May 31, 1970 could have, but was not required, to decline, rise or remain stable in value. In floating its currency, the Canadian Government surrendered control over the international exchange rate of the Canadian dollar and was powerless to require or approve changes in its exchange value. The Canadian Government being unable to require changes in the exchange rate of the floating dollar, the changes in the Canadian dollar's exchange rate resulting in higher costs to plaintiff was without the approval or requirement of that Government, as required by the Wage Escalation clause.

As the Canadian Government's action in allowing its dollar to float neither required nor approved increases in plaintiff's contract costs, that action does not qualify as a basis for contract price modification under the Wage Escalation clause.

The restriction in the Wage Escalation clause limiting contract price modifications to those labor cost increases required and approved by the Canadian Government supports defendant's interpretation and the court's conclusion that

the Wage Escalation clause was intended by the parties to alleviate the risks attendant to the Canadian Government's control, under prior U.S.-Canadian agreements, of contractor's Canadian labor's wages and collateral benefits costs. That restriction assures the contractor of price protection for all labor costs controlled by the Canadian Government, and simultaneously delineates defendant's potential contract price modification obligations to those specific labor costs which, under the prior U.S.-Canadian agreements, the Canadian Government could unilaterally impose on the contractor. This interpretation which confines contract price modifications to these specific labor costs not only comports with the intent of the parties, and the language of the Wage Escalation clause, but is consistent with the ASPR requirement limiting price escalation in fixed-price contracts to "certain contingencies which are specifically defined in the contract." [9]

In addition to relying on the language of the Wage Escalation clause, plaintiff seeks to support its position by reference to the history and parties' course of conduct on all other DEW Line procurements. Plaintiff contends that under all other DEW Line contracts, except plaintiff's presently disputed one, defendant and not plaintiff bore the risk of currency exchange rate fluctuations, and that risk was not shifted to plaintiff by osmosis [10] by the mere change from an FPIF contract to an FFP contract.

Complementing this argument is plaintiff's assertion that the court should follow the Board's rationale in *Federal Electric Corporation, supra,* and grant plaintiff price relief as the ASBCA did, even disregarding the Wage Escalation clause, to effectuate the parties' true contractual intent as implied from the terms of their agreement. Both of these arguments must be rejected.

While osmosis may be an ineffectual method of shifting substantial cost risks, we find nothing osmotic in the shift of the risk of currency exchange rate fluctuations in the parties' deliberate shift from their prior cost and incentive type of contracts to an FFP contract, especially where the Board found nothing to suggest that the parties were unaware of the distinguishing characteristics of an FFP contract, or that the measured progression through contract types was inadvertent.[11]

█ It has long been recognized that in FFP contract situations the payee party, absent a specific contrary contract provision assumes the risk of currency valuation changes. *Legal Tender Cases,* 79 U.S. (12 Wall.) 457, 20 L.Ed. 287 (1871); *Deutsche Bank Filiale Nurnberg v. Humphrey,* 272 U.S. 517, 519, 47 S.Ct. 166, 71 L.Ed. 383 (1926). The Armed Services Procurement Regulations which are law binding on the parties in a Government contract and govern the interpretation of the contract, *Chris Berg, Inc. v. United States,* 426 F.2d 314, 317, 192 Ct.Cl. 176, 182 (1970), acknowledge the FFP contractor's assumption of full responsibility for *all* costs over the firm fixed-price.[12] Plaintiff errs in arguing that in signing its FFP contract it accepted only identified risks within its power to control.

9. Id.

10. Plaintiff's brief, p. 22.

11. *ITT Arctic Services, Inc., supra,* n. 1 at 42,-595.

12. 32 C.F.R. § 3.404–2 (1969):

§ 3.404–2 Firm fixed-price contract.

"(a) *Description.* The firm fixed-price contract provides for a price which is not subject to any adjustment by reason of the cost experience of the contractor, in the performance of the contract. This type of contract, when appropriately applied as set forth below, places maximum risk upon the contractor. Because the contractor assumes full responsibility, in the form of profits or losses, for all costs under or over the firm fixed-price, he has a maximum profit incentive for effective cost control and contract performance. Use of the firm fixed-price contract imposes a minimum administrative burden on the contracting parties."

\* \* \* \* \* \*

We have consistently held that the contractor in a fixed-price contract assumes the risk of unexpected costs. *Sperry Rand Corp. v. United States,* 201 Ct.Cl. 169, 181, 475 F.2d 1168, 1175–76 (1973); *Aerojet-General Corp. v. United States,* 199 Ct.Cl. 422, 434, 467 F.2d 1293, 1300–01 (1972); *Rolin v. United States,* 142 Ct.Cl. 73, 82, 160 F.Supp. 264, 268–69 (1958). *See also* 3 Corbin, Contracts § 598 (2d ed. 1960) at 590. In firm fixed-price contracts, risks fall on the contractor, and the contractor takes account of this through his prices. Nash, *Risk Allocation in Government Contracts,* 34 Geo. Wash.L.Rev. 693, 694–96, 701–02 (1966).[13]

Equally without legal significance is plaintiff's statement that in signing its FFP contract it did not agree to accept the risk of currency exchange rate fluctuations. *Kenneth Reed Constr. Corp. v. United States,* 475 F.2d at 588, 201 Ct.Cl. at 291.

Despite the historic locus of the currency exchange rate fluctuation risk burden under all other DEW Line O & M contracts, the fact remains that in accepting an FFP contract, plaintiff accepted the risk and responsibility "for *all* costs under or over the firm fixed-price".[14] This was a risk repeatedly held to include changes in currency values, and we find nothing unfair, unreasonable or illogical in holding the parties to the terms of their FFP contract, and enforcing the rule that:

 \* \* \* Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. \* \* \*. *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918).

In *Federal Electric Corporation, supra,* the Board, unable to find any contractual basis for a price adjustment in plaintiff's CPIF contract, granted plaintiff price relief to give effect to the parties' true contractual intent that plaintiff's incentive fee be reduced only for cost increases within plaintiff's general management control risk, and not by events beyond the control of either party. Plaintiff urges the court to apply the *Federal Electric* rationale and grant plaintiff price relief in the absence of a contractual provision to effectuate the true contractual intent of the parties. Plaintiff failed to make this argument to the Board, even though, as plaintiff asserts, "[t]he facts presented in this litigation are, in all relevant respects, identical to those presented in the *Federal Electric* appeal." *Plaintiff's Reply Brief* at p. 13. In making this argument, plaintiff ignores the significant differences between the CPIF contract in *Federal Electric* and the FFP contract in the instant case, and that the Board's decision in the latter case was motivated by regard for "the goal inherent in incentive contracting." *Federal Electric Corporation, supra,* at 22,573. Our assessment of the parties' true contractual intent in the present case must likewise be motivated by regard for the different goal inherent in FFP contracting. That intent is adequately evidenced by the parties' use of an FFP contract. FFP contracting places maximum risk on the contractor for all costs over the fixed price including unanticipated ones. There is no evidence that defendant intended to reduce plaintiff's assumption of cost risks other than by way of the Wage Escalation clause. Absent such evidence the goal inherent in FFP contracting, that plaintiff bear all costs without additional compensation, must be regarded as the parties' true contractual intent. We see no basis, other than the Wage Escalation clause, inapplicable in the present case, to relieve plaintiff of the burden of currency exchange rate fluctuations.

---

**13.** *McNamara Construction of Manitoba, Ltd. v. United States,* 509 F.2d 1166, 1169–70, 206 Ct.Cl. 1, 8 (1975).

**14.** 32 C.F.R. § 3.404–2(a) (1969) (Emphasis added).

Plaintiff's argument in this regard is likewise inconsistent with its summation statement that "[w]hen all the rules and aids are stripped away, the basic question is whether *this* plaintiff is entitled to relief under *this* contract by virtue of a specific contract clause." *Plaintiff's Reply Brief* at p. 2; Plaintiff's emphasis.

Plaintiff attempts to bolster the validity of its interpretation of the disputed contract clauses by ascribing to the Government an untenable interpretation, denied by the Government, of the same contract clauses, and labeling it unreasonable. Thus, plaintiff argues that since the Government's interpretation is unreasonable, and plaintiff's interpretation reasonable, the former must be rejected, and the latter prevail. This is an artificial conclusion.

Plaintiff erroneously casts the Government's interpretation of the disputed clauses as essentially treating the words in paragraphs 2 and 3 of Part IV of the contract's Special Provisions as synonymous, and entitling plaintiff to a contract price modification only when the Canadian Department of Labour orders a wage or salary increase. Defendant's interpretation plaintiff refutes as unreasonable by pointing to the obvious differences in the meaning and breadth between the words "wages" and "Canadian Department of Labour" employed in paragraph 2, and the words "labor costs" and "Canadian Government" utilized in paragraph 3, and concluding an interpretation treating them synonymously is unreasonable as contrary to the plain meaning of the words, and volitive of several recognized fundamental rules of contract interpretation. This unreasonable "Government" interpretation, plaintiff argues, must be rejected.

Plaintiff's argument must be rejected as based on an erroneous view of the Government's interpretation of the disputed contract clauses. Defendant admits the use of the different terms in the two paragraphs was intended to broaden the protective contract price escalation coverage afforded plaintiff under the Wage Escalation clause to include more than just wage increases ordered by the Canadian Department of Labour. Defendant acknowledges that action of Canadian Government agencies other than the Canadian Department of Labour could increase plaintiff's labor costs, and that under the Wage Escalation clause, plaintiff would be entitled to an upward price modification for these increases. It cites as an example of such increases entitling plaintiff to a contract price modification for increased labor costs the imposition by Canadian health authorities of new more costly health services for plaintiff's Canadian labor. Plaintiff likewise provides another similar example of such a protected increase in citing *Morrison-Knudsen Co. v. United States,* 427 F.2d 1181, 192 Ct.Cl. 410 (1970), wherein the court granted the contractor price relief from the U. S. Congress' imposition of increased Social Security taxes. If the Canadian Government had imposed or increased employment taxes on plaintiff, undoubtedly such increases would entitle plaintiff to a contract price increase. In short, Part IV, paragraph 3 of the parties' contract's Special Provisions reasonably provides, as defendant contends, price escalation for a wide variety of labor cost increases the Canadian Government could impose on plaintiff, and not only for wage increases ordered by the Canadian Department of Labour. However, as indicated above, that clause does not reasonably purport to afford plaintiff price escalation protection for currency exchange rate increases.

■ Collateral to the above argument is plaintiff's assertion that conceding the reasonableness of defendant's contract interpretation, plaintiff should prevail under the rule of *contra proferentem.* The necessary precursor for resort to the rule of *contra proferentem* is the determination that a contract clause is ambiguous, *i. e.,* susceptible of more than one reasonable interpretation.[15] "Contracts are not necessarily rendered ambiguous by the mere fact that the parties disa-

15. *See J. W. Bateson Co. v. United States,* 450 F.2d 896, 902, 196 Ct.Cl. 531, 543 (1971).

gree as to their meaning. There must be a reasonable uncertainty of meaning." *Southern Constr. Co. v. United States,* 364 F.2d 439, 452–53, 176 Ct.Cl. 1339, 1361 (1966). As we have concluded that the Wage Escalation clause is susceptible to only one reasonable interpretation, and no reasonable uncertainty exists as to that interpretation, the *contra proferentem* rule cannot be applied in plaintiff's favor.

As an alternative remedy only plaintiff urges the court to reform the contract on the basis of the parties' mutual mistake of fact. Plaintiff bases its contract reformation claim on the assertion that both parties entered the contract mistakenly assuming that the Canadian exchange rate would remain static during the life of the parties' agreement. In support of this contention, plaintiff points to evidence establishing that neither party gave any thought at all to the possibility of a change in the Canadian exchange rate existing at the outset of the parties' contract. The evidence does not, however, establish that defendant shared plaintiff's assumption as to the continued stability of the Canadian exchange rate or that defendant would have agreed to plaintiff's proposed reformation at the same FFP contract price.

 The court's decision in *McNamara Constr. of Manitoba, Ltd. v. United States,* 509 F.2d 1166, 206 Ct.Cl. 1 (1975), renders unnecessary extensive discussion in disposing of this argument. In *McNamara* the court denied an FFP contractor contract reformation relief for its higher labor costs due to labor unrest beyond contractor's control. The court repudiated the availability of contract reformation for mutual ignorance:

> For reformation we would need some antecedent expressions by the parties at variance with the terms of the contract or some articulated mutual assumption regarding [Canadian exchange rates] behavior which we could incorporate into the agreement or

some indication that a mutual mistake existed as to a hard fact on which the parties had based the contract. * * *[16]

Plaintiff's failure to show any of the above elements or that defendant "would have been willing, if it had known the true facts from the beginning, to bear a substantial part of the additional expenses." *National Presto Industries, Inc. v. United States,* 338 F.2d 99, 112, 167 Ct.Cl. 749, 769 (1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965), precludes contract reformation.

On *de novo* consideration of plaintiff's claim, we concur with the Board's decision that the Wage Escalation clause in plaintiff's contract does not afford price modification protection for the increased costs of floating Canadian currency.

Accordingly, defendant's cross-motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. The petition is dismissed.

---

**16.** *McNamara Construction of Manitoba, Ltd. v. United States, supra,* 509 F.2d at 1171, 206 Ct.Cl. at 10.