**TRANSPACE CARRIERS,
INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 380–89C.

United States Claims Court.

Nov. 21, 1990.

Douglas L. Patin, Washington, D.C., for plaintiff. Stuart C. Nash, Washington, D.C., of counsel.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Sara Najjar, Office of General Counsel, National Aeronautics and Space Admin., of counsel.

## OPINION

MARGOLIS, Judge.

This government contracts case is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment. In May 1984, the parties executed a Preliminary Agreement setting forth the terms under which the plaintiff, Transpace Carriers, Inc. ("Transpace" or "TCI"), could qualify to take over one of the launching programs run by the defendant, National Aeronautics and Space Administration (NASA). Transpace claims that NASA breached the Preliminary Agreement. NASA argues that Transpace failed to exhaust its administrative remedies prior to filing suit. After a careful review of the record, and after hearing oral argument, this court finds that Transpace failed to exhaust the administrative remedies mandated by the Preliminary Agreement. Accordingly, the complaint is dismissed without prejudice.

## FACTS

The defendant, NASA, is an agency of the federal government which is charged with implementing the National Aeronautics and Space Act of 1958 (as amended). NASA operates various space programs, and as recently as 1982 these programs included launching expendable launch vehicles (ELVs), which NASA used to propel objects such as satellites into space. In 1982, President Ronald Reagan introduced a policy to use the newly-developed space

shuttle instead of ELVs to propel objects into space. The President further announced that the government would seek to expand private sector involvement in space activities, and later endorsed the idea of having the private sector commercially operate ELV programs.

The plaintiff, TCI, contacted NASA to propose that TCI acquire and commercially operate one of NASA's ELV programs known as the Delta Program. The parties entered into a Preliminary Agreement setting forth the terms upon which TCI could attempt to qualify to take over the Delta program. Under the Preliminary Agreement, TCI was to satisfy NASA that TCI had acquired the "technical, financial, and contractual capability to conduct a viable commercial Delta ELV program." Provided TCI met the requirements prior to the deadline set in the Preliminary Agreement, NASA agreed that it would negotiate a "Definitive Commercialization Agreement" to transfer the program to TCI. NASA also agreed that TCI would have the exclusive right to market commercial Delta launch services for the duration of the Preliminary Agreement. Pursuant to section 110 of Public Law No. 98–52, codified at 42 U.S.C. § 2465, the Preliminary Agreement became effective after certain Congressional committees voiced no objections.

The parties agreed to amend the Preliminary Agreement several times, extending the deadline for Transpace to meet the criteria to take over the Delta program. The last amendment to the Preliminary Agreement altered the criteria which Transpace was required to meet in order to qualify for the takeover and provided that the deadline for Transpace to qualify was May 31, 1986. The parties executed no Definitive Commercialization Agreement prior to May 31, 1986. Though Transpace claims that negotiations were continuing even after the deadline, by letter dated October 10, 1986, NASA notified Transpace that it was transferring the Delta program to another company instead of Transpace.

On July 6, 1989, TCI filed this complaint claiming that NASA's conduct in transferring the program to another company constituted a breach of contract, on several alternative grounds. TCI claims that the Preliminary Agreement was still in effect, by the conduct of the parties, at the time NASA transferred the program to another company. TCI also claims that, except for the execution of a Definitive Commercialization Agreement, TCI fully qualified to take over the Delta program, and that the Commercialization Agreement was unreasonably withheld by NASA. TCI has demanded damages in the form of direct damages and lost profits.

NASA has now filed this motion, advancing several alternative grounds for the dismissal of the complaint. First, NASA argues that TCI failed to exhaust the administrative remedies required by the Preliminary Agreement. Second, NASA argues that the complaint fails to state a claim upon which relief can be granted for several reasons: that the Preliminary Agreement expired, and therefore NASA could not have breached it; that Transpace assumed all risks relating to any failure of the parties to enter into a definitive agreement; and that TCI's demand for lost profits is precluded by the Preliminary Agreement.

## DISCUSSION

Because the defendant has submitted materials outside of the pleadings in support of its motion, this court shall treat the defendant's motion as a motion for summary judgment. *See Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972). Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. RUSCC 56(c). The threshold issue is whether the disputes clause in the Preliminary Agreement mandated Transpace to exhaust certain administrative remedies prior to filing suit.

*Interpretation of Disputes Clause is a Question of Law*

NASA claims that Transpace was required to attempt to resolve this dispute

first with NASA according to the procedures outlined in the disputes clause, Article IX, of the Preliminary Agreement. This disputes clause provides:

> Any dispute, whether or not involving an alleged breach of this Agreement, concerning a question of fact or of law arising under this Agreement which is not disposed of by agreement, shall be reviewed by the NASA Associate Administrator for Space Flight, who shall attempt to resolve the dispute. If the timely resolution of the NASA Associate Administrator for Space Flight is not successful after written submission to him, either party may mail or otherwise furnish a written appeal addressed to the NASA Administrator and the President, or other appropriate official, of TCI. The joint decision of the NASA Administrator and the President of TCI, or their duly authorized representatives for the determination of such appeal, shall be final and conclusive. In the absence of such joint resolution, neither party to this Agreement is precluded from pursuing any right or remedy in any court or other tribunal of competent jurisdiction.

TCI does not dispute that it did not exhaust the administrative procedures specified in the disputes clause. Instead, TCI argues that the disputes clause does not apply in this instance. Both parties point to the contract language to support their positions. It is well settled that the interpretation of contract language is a question of law, *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985), and is therefore susceptible of determination by summary judgment. *Government Systems Advisors, Inc. v. United States*, 847 F.2d 811, 812 n. 1 (Fed.Cir.1988).

*The Disputes Clause Applies to Breach Claims*

█ NASA argues that the clause was intended to apply to *any* dispute, and the language "whether or not involving an alleged breach of this Agreement" clearly means that the clause applies to breach claims such as this one. Not only is this argument persuasive on its face, it is

strengthened by the traditional interpretation of the former government contracts disputes clause. Prior to the Contract Disputes Act of 1978,[1] 41 U.S.C. § 601 *et seq*, the standard disputes clause in government contracts covered "any dispute concerning a question of fact arising under this contract." *Edward R. Marden Corp. v. United States*, 194 Ct.Cl. 799, 804 n. 2, 442 F.2d 364, 367 n. 2 (1971). The Supreme Court recognized the standard disputes clause *not* to cover disputes involving breaches of contract, but *only* to cover disputes for which a specific contract provision gives a remedy. *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 412, 86 S.Ct. 1545, 1555, 16 L.Ed.2d 642 (1966). Thus, in *United States v. Triple A Machine Shop, Inc.*, the U.S. Court of Appeals for the Ninth Circuit reiterated the interpretation of a long line of cases construing the phrase "disputes arising under the contract" in an unamended standard disputes clause to mean disputes which are capable of complete resolution by a procedure specified in the contract. 857 F.2d 579, 583 (9th Cir.1988) (citations omitted). Breach claims, by contrast, referred to claims where no contract provision provided a means of resolving the dispute.

Under the standard disputes clause, disputes involving allegations of breach of contract were distinguished from disputes for which administrative dispute resolution procedures were provided in the contract. Contractors were permitted to sue immediately for breach claims, but were required to exhaust administrative remedies for all other claims. *See id.* (citation omitted). In our case, the disputes clause differs from the standard disputes clause. The words "whether or not involving an alleged breach" are inserted in the first sentence of the disputes clause of the Preliminary Agreement. NASA concludes that these words suggest that the parties intended this disputes clause to depart from the traditional meaning, and to cover all disputes, whether or not the dispute involved a breach.

---

1. Neither party has claimed that the Contract Disputes Act governs this case.

█ The Fifth Circuit Court of Appeals decided an analogous case. In *Patton Wrecking & Demolition Co. v. Tennessee Valley Authority,* the parties modified the standard disputes clause to cover "[a]ny dispute arising out of or connected in any way with any obligation of the parties arising out of the performance or nonperformance of the contract whether arising before or after completion of performance, including disputes as to any alleged violation or breach thereof." 465 F.2d 1073, 1075 n. 1 (5th Cir.1972). While the district court found the language ambiguous as to whether breach claims were covered by the disputes clause, the Circuit Court reversed, holding that breach claims were clearly covered by the clause. The court observed that to limit the clause to cover disputes only "arising under" the contract "fails to properly account for the significance of the change in language." *Id.* at 1078. Here, too, the parties have deliberately changed the standard disputes clause by inserting the words "whether or not involving an alleged breach." These words manifest an intention by the parties to resolve *any* dispute by recourse to the administrative procedures, regardless of whether the dispute is a breach claim.[2]

Transpace, however, points to the phrase "arising under the Agreement" and claims that this phrase limits the coverage of the disputes clause. Instead of covering all disputes, Transpace claims that the clause covers only those disputes for which a remedy procedure is provided in the Agreement, *i.e.,* it covers only non-breach disputes.

It is well settled that a contract must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions, *Arizona v. United States,* 216

Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978), and that an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of its useless. *Id.; ITT Arctic Services, Inc. v. United States,* 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975) (citation omitted). Taking the clause as a whole, the inclusion of the phrase "arising under the Agreement" in this disputes clause need not be read to negate the phrase "whether or not involving an alleged breach of this Agreement." Instead, the phrases could be read as alternatives. The language "whether or not involving an alleged breach of this Agreement" clearly manifests an intention to include breach claims in the dispute resolution procedures, while the phrase "disputes arising under the Agreement" manifests an intention to include non-breach claims in these procedures as well.

By contrast, TCI's suggested interpretation would require this court to ignore significant portions of the contract. First, if this court concluded that the disputes clause only applied to non-breach claims, then it would be necessary to ignore the phrase "whether or not involving an alleged breach of this Agreement," even though the phrase was rather conspicuously placed, set off by commas in the very beginning of the disputes clause. Second, Article VI of the Preliminary Agreement contains another reference to breach claims which this court would have to ignore if it were to accept the plaintiff's interpretation. That article provides:

Without affecting the right of TCI to pursue the procedure under the Disputes provision set forth in Article IX, TCI shall not make any prior claim based on an expressed or implied provision of this Agreement, *including a breach of this*

2. At oral argument, TCI asserted that the disputes clause should not apply to breach claims because other provisions of the Preliminary Agreement provide for redress of certain non-breach disputes. However, TCI's argument is unavailing. Where there is an unamended standard disputes clause covering "disputes arising under the contract," a court must determine whether the dispute is capable of complete resolution by a procedure specified in the contract. *Patton,* 465 F.2d at 1080. Under most standard

government contracts, redress is by resort to contractual clauses or by regulation specifying remedies for certain types of disputes, *e.g.,* for changes or delays. *Id.* (citing *Morrison–Knudsen Co. v. United States,* 170 Ct.Cl. 757, 763, 345 F.2d 833, 837 (1965)). "The concept of redressability of a dispute 'arising under' the contract however does not apply to this dispute under the amended contract language." *Id.* Here, as in *Patton,* the disputes clause was amended to cover breach claims.

*Agreement,* against the U.S. Government ... for the improper performance or nonperformance by the U.S. Government ... of this ... Agreement.

(Emphasis supplied.) To accept TCI's interpretation, this court would also have to ignore this language.

Since NASA's interpretation gives meaning to all parts of the contract and is consistent with established case law interpreting government contracts disputes clauses, this court holds that the disputes clause in the Preliminary Agreement applies to all disputes, whether or not involving a breach.[3]

*The Administrative Remedies are Not Futile*

■ Transpace next argues that, even if this dispute is covered by the disputes clause, the administrative remedies provided in the clause are futile. Therefore this court should not force the plaintiff to submit to these procedures. It is true that a court may not require the parties to exhaust their administrative remedies where it is shown by clear evidence that such procedure is "inadequate or unavailable." *United States v. Grace & Sons,* 384 U.S. 424, 429–30, 86 S.Ct. 1539, 1542–43, 16 L.Ed.2d 662 (1966). The Supreme Court has suggested that administrative procedures might be inadequate or unavailable if the contracting officer reveals an unwillingness to act, or where a government official has too little authority to give relief.

*Id.* However, the Court also noted that "the inadequacy or unavailability of administrative relief must clearly appear before a party is permitted to circumvent his own contractual agreement." *Id.* at 430, 86 S.Ct. at 1543. Here, it is not clear that such remedies are inadequate or unavailable. TCI maintains that NASA is unwilling to reach a joint resolution because NASA denied liability in its answer. However, the litigation stance of NASA is not enough to conclude that the administrative procedures provided in the Agreement are inadequate or unavailable. *See Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 107 (D.C.Cir.1986). TCI also points to NASA's letter of October 10, 1986, stating that NASA would not contract with TCI for the commercialization of Delta ELVs. This fact does not prove that the administrative remedies are futile. The parties are not prevented from reaching a settlement of TCI's breach claim.[4]

*Dismissal is Proper*

■ Finally, Transpace requests this court not to dismiss the complaint, but rather to stay the action pending the outcome of the administrative procedures. Transpace suggests that a stay will save the expenses of refiling a complaint. This court opts instead to dismiss the complaint. One of the reasons for requiring parties to exhaust their contractual remedies prior to

---

3. TCI also argues that the disputes clause was intended to cover only "operational disputes." Yet TCI cites no contract language supporting its view. It is well settled that in interpreting contracts, "[t]he parties' intent must be gathered from the instrument as a whole." *ITT Arctic Services,* 207 Ct.Cl. at 751, 524 F.2d at 684 (citation omitted). Since TCI can point to no portion of the contract manifesting an intent for the disputes clause to cover only operational disputes, this court must reject TCI's argument.

Moreover, TCI cannot maintain that, under the rule of *contra proferentem,* any ambiguities must be resolved against the drafter. Before the court could conclude that the contract is ambiguous, the clause must be susceptible of more than one reasonable interpretation. *ITT Arctic Services,* 207 Ct.Cl. at 767, 524 F.2d at 692 (citation omitted). TCI has not advanced a reasonable interpretation, and has therefore failed to establish that the contract is ambiguous.

4. This court notes that "federal courts have recognized a strong federal policy in favor of voluntary commercial arbitration." *Randolph–Sheppard,* 795 F.2d at 101 n. 18 (quoting *Hanes Corp. v. Millard,* 531 F.2d 585, 597 (D.C.Cir. 1976); citing *Schattner v. Girard, Inc.,* 668 F.2d 1366, 1369 (D.C.Cir.1981)). The United States Arbitration Act provides that agreements to arbitrate a commercial dispute "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* (quoting 9 U.S.C. § 2 (1982)). "The policy of the Arbitration Act is that agreements to arbitrate should be liberally construed, with all doubts resolved in favor of arbitration." *Id.* (citing *Moses H. Cone Memorial Hospital v. Mercury Construction Co.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983); *Schattner,* 668 F.2d at 1369; *Hanes Corp.,* 531 F.2d at 597).

filing suit is that these remedies may be a more expeditious way to settle disputes than litigation. *See Grace & Sons*, 384 U.S. at 429, 86 S.Ct. at 1542. More meaningful discussion may be available if there is no litigation tainting the process. Moreover, there is little chance that the limitations period will expire before Transpace could refile its complaint.[5]

### CONCLUSION

The disputes clause in the Preliminary Agreement covers breach claims. Transpace failed to exhaust the administrative remedies provided in the disputes clause. The administrative remedies are not unavailable or inadequate. Therefore, defendant's motion for summary judgment is granted. The plaintiff's complaint is to be dismissed without prejudice. The Clerk is directed to enter judgment accordingly.

**5.** This court does not reach the issue, raised by the defendant, as to whether NASA would have any authority to negotiate a joint resolution if this action were stayed.